UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARGUERITE KUROWSKI and BRENDA MCCLENDON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RUSH SYSTEM FOR HEALTH D/B/A RUSH UNIVERSITY SYSTEM FOR HEALTH,<br><br>Defendant | CASE NO. 22 Civ. 5380<br><br>HON. MATTHEW F. KENNELLY |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S RULE 12(B)(6) MOTION TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..................... ii

INTRODUCTION ..................... 1

FACTUAL BACKGROUND ..................... 3

STANDARD OF REVIEW ..................... 4

ARGUMENT ..................... 4

I. THE COMPLAINT STATES A CLAIM UNDER THE FEDERAL WIRETAP ACT ..................... 4

A. Rush "Intercepted" Plaintiffs' Communications ..................... 4

B. Rush Acts as an "Electronic Communication Service" by Providing the Patient Portal ..................... 8

C. Plaintiffs Allege Rush Disclosed the Contents of Their Communications . 9

II. THE COMPLAINT STATES A CLAIM FOR BREACH OF THE IMPLIED DUTY OF CONFIDENTIALITY UNDER ILLINOIS LAW ..................... 10

III. THE COMPLAINT STATES A CLAIM UNDER THE ILLINOIS DECEPTIVE AND UNFAIR PRACTICES CONSUMER FRAUD ACT ..................... 12

A. Plaintiffs Allege Personal Deception ..................... 13

B. Rush Implicitly Admits Its Website Does Not Disclose the Privacy Violations Here ..................... 14

C. Plaintiffs Allege Actual Pecuniary Loss ..................... 15

IV. PLAINTIFFS HAVE SATISFIED ALL ELEMENTS OF THEIR UNIFORM DECEPTIVE TRADE PRACTICES CLAIM ..................... 16

V. THE COMPLAINT STATES A CLAIM FOR INTRUSION UPON SECLUSION ..................... 17

CONCLUSION ..................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Quicken Loans Inc.*,
No. CV1712352ESMAH, 2018 WL 5874088 (D.N.J. Nov. 9, 2018) ....................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................4

*Billings v. Atkinson*,
489 S.W.2d 858 (Tex. 1973)......................................................................................18

*Clayton v. Richards*,
47 S.W.3d 149 (Tex. App. 2001)................................................................................18

*Crowley v. Cybersource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) .........................................................................5

*Dinerstein v. Google*, LLC,
484 F. Supp. 3d 561 (N.D. Ill. 2020) ..........................................................................18

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
834 F. Supp. 1008 (N.D. Ill. 1993) .............................................................................16

*Duncavage v. Allen*,
147 Ill. App. 3d 88, 497 N.E.2d 433 (1986) ..................................................................16

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ...................................................................................4, 5

*Forth v. Walgreen Co.*,
No. 17-CV-2246, 2018 WL 1235015 (N.D. Ill. Mar. 9, 2018)...........................................17

*Garner v. Amazon.com, Inc.*,
No. C21-0750RSL, 2022 WL 1443680 (W.D. Wash. May 6, 2022) ......................................8

*Geisberger v. Willuhn*,
72 Ill.App.3d 435 (2d Dist.1979)................................................................................11

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)....................................................................................5, 7

*Harkey v. Abate*,
346 N.W. 74 (Mich. App. 1983)....................19

*Henry v. Teletrack, Inc.*,
No. 11-CV-4424, 2012 WL 769763 (N.D. Ill. Mar. 7, 2012)....................10

*Hoskins v. Howard*,
971 P.2d 1135 (Id. 1998) ....................18

*Khorloo v. John C. Heath Att'y at L., PLLC*,
No. 18-CV-01778, 2020 WL 1530735 (N.D. Ill. Mar. 31, 2020)....................15, 16

*Latture v. Emmerling*
(Mich. App. 2013)....................18

*LeCrone v. Ohio Bell Tel. Co.*,
201 N.E.2d 533 (Oh. App. 1963)....................18

*In re Meta Pixel Healthcare Litig.*,
No. cv-22-03580-WHO (Nov. 9, 2022), 19:12–18....................15

*Nader v. Gen. Motors Corp.*,
25 N.Y.2d 560 (1970) ....................18

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)....................5

*Oliveira v. Amoco Oil Co.*,
201 Ill. 2d 134, 776 N.E.2d 151 (2002) ....................14, 15

*Pascal Pour Elle, Ltd. v. Jin*,
75 F. Supp. 3d 782 (N.D. Ill. 2014) ....................8

*Proft v. Raoul*,
944 F.3d 686 (7th Cir. 2019) ....................4

*Ruzicka Elec. & Sons v. IBEW*,
427 F.3d 511 (8th Cir. 2005) ....................18

*Smoke Shop, LLC v. United States*,
761 F.3d 779 (7th Cir. 2014) ....................6

*Souder v. Pendleton Detectives*,
88 So.2d 716 (La. App. 1956)....................18

*Steele v. Life Ins. Co. of N. Am.*,
507 F.3d 593 (7th Cir. 2007) ....................7

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) ....................5, 6, 7

*White v. Samsung Elecs. Am., Inc.*,
No. CV 17-1775, 2019 WL 8886485 (D.N.J. Aug. 21, 2019)....................5

**Statutes**

410 ILCS § 513/10....................3

815 ILCS 510/3....................16

18 U.S.C. § 2510....................8

18 U.S.C. § 2711....................8

42 U.S.C. § 1320d-6 ....................6

DTPA ....................3, 16, 17

Electronic Communications Privacy Act....................5, 8

HIPAA .................... *passim*

ICFA .................... *passim*

Illinois Deceptive and Unfair Practices Consumer Fraud Act....................2, 12

Illinois Uniform Deceptive Trade Practices Act....................3

Maryland Wiretap Act ....................1

Uniform Deceptive Trade Practices Act....................16

Washington Consumer Protection Act....................1

Wiretap Act....................2, 4, 5, 6

**Other Authorities**

45 C.F.R. § 164.514....................3

Rule 12(b)(6)....................4

## INTRODUCTION

The Office of Civil Rights at the United States Department of Health and Human Services ("HHS") recently issued a release concerning online tracking technologies used by HIPAA covered entities condemning the exact same conduct alleged in Plaintiffs' Complaint.[1] HHS concluded that "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI)." It clarified that HIPAA protects both authenticated (*i.e.* patient portal) and unauthenticated (*i.e.* public) pages. HHS's conclusion is as unsurprising as it is determinative.

Rush has violated its patients' privacy rights by placing hidden tracking pixels on its web properties, intercepting Plaintiffs' communications with their healthcare providers, and surreptitiously transmitting the contents of those communications to third parties for marketing purposes. Courts nationwide have uniformly upheld claims targeting such practices. For example, the court in *Doe v. Virginia Mason Med. Ctr*. denied the defendant's motion to dismiss the plaintiff's claims for violations of the Washington Consumer Protection Act, Identify Theft, Invasion of Privacy, Fraudulent Concealment, and Breach of the Duty of Confidentiality. 2020 WL 1983046 (King Cnty. Super. Ct. Feb. 12, 2020) (Ex. 1). More recently, the court in *Doe v. MedStar Health Inc*. denied the defendant's motion to dismiss claims for violations of the Maryland Wiretap Act and for Intrusion upon Seclusion. No. 24-C-20-000541 (Baltimore City, MD Aug. 5, 2020) (Ex. 2).[2]

---

[1] The full release is attached hereto as Exhibit 1. Exhibits are referred to herein simply as "Ex__."

[2] *See also Doe v. Universal Hosp. Health Sys., Inc*., No. CV-20-933357 (Ohio C.P. Nov. 16, 2020) (Ex. 3) (denying motion to dismiss lawsuit concerning healthcare provider's transmission of patients' healthcare information); *Doe v. Universal Hospitals Health Sys., Inc*., No. CV-20-933357 (Ohio C.P. June 25, 2021) (Ex. 4) (same); *Doe v. Sutter Health*, No. 34-2019-00258072-CU-BT-GDS (Cal. Super. Ct. June 8, 2022) (Ex. 5) (same); *Doe v. Bon Secours Mercy Health*, No. A2002633 (Ohio C.P. Nov. 23, 2021) (Ex. 6) (same); *Doe v. Partners Healthcare Sys., et al*., No. 1984CV01651 (Mass. Super. Ct. Nov. 20, 2020) (Ex. 7) (same). Tellingly, Rush's opening paragraph only cites to cases which are entirely inapplicable (*i.e. Smith*) or which

Defendant's arguments are based on the non-sequitur that "*anyone can visit Rush's public website, at any particular time, for any purpose whatsoever*." MTD at 3 (emphasis in original). This strawman has no bearing on a case like this, which is brought by patients—not "anyone." *See* Compl. ¶ 175. Moreover, HSS has rejected the very same argument Rush makes, stating that individually identifiable health information collected on a regulated entity's website generally is PHI, *even if the data does not include specific treatment or billing information like dates and types of health care services*.

Yet in clear violation of HHS's guidance on already-existing regulations, Rush surreptitiously collects and transmits that information to third parties for marketing purposes. This gives rise to five causes of action, each of which are adequately stated in the Complaint.

*First*, the Complaint states a claim under the Wiretap Act because Rush oversees an "Electronic Communications Service" and uses hidden tracking pixels to intercept communications between patients, including Plaintiffs, and their doctors.

*Second*, the Complaint alleges a claim for breach of the implied duty of confidentiality under Illinois law. Contrary to Rush's mischaracterizations, Plaintiffs have alleged numerous confidentiality breaches that would "violate the statutory physician-patient privilege."

*Third*, the Complaint states a claim under the Illinois Deceptive and Unfair Practices Consumer Fraud Act ("ICFA"), because (a) Plaintiffs are Rush patients that have been directly misled by Rush and therefore have been "personally deceived," (b) the disclosures Rush points to are blatantly insufficient and misleading on their face, and (c) Plaintiffs have alleged the kind of

---

were voluntarily dismissed for jurisdictional reasons (*i.e. UPMC*, *ProMedica*, and *Northwestern*). In fact, *plaintiffs have prevailed in every similar case in which the court considered the merits of their claims*. Further, class certification has already been granted in one such case. *Doe v. Virginia Mason Med. Ctr.*, Case No. 19-2-26674-1-SEA (Wash. Super. Ct. Sept. 27, 2021)) (Ex. 1).

"benefit of the bargain" pecuniary harm that is acceptable under the caselaw Rush itself cites.

*Fourth*, the Complaint states a claim for damages and injunctive relief under the Illinois Uniform Deceptive Trade Practices Act ("DTPA"). Illinois law permits Plaintiffs to recover damages for DTPA violations when raised alongside ICFA claims, as here. And in any event, Plaintiffs have pled a future harm because unless Rush changes its practice, they will be forced to choose between the continuity of their medical care and an invasion of their privacy.

*Fifth*, the Complaint states a claim for Intrusion upon Seclusion because it specifically pleads that both the initial collection and the subsequent transmission of their data was improper.

## FACTUAL BACKGROUND

The law and facts underlying this case are simple. Defendant Rush System for Health d/b/a Rush University System for Health operates a hospital network and maintains web properties, including www.rush.edu and mychart.rush.edu, for the purpose of communicating with its patients. Compl. ⁋⁋ 10, 16. The latter allows patients to log in to an online MyChart patient portal where they can communicate with Rush and their healthcare providers about lab results, treatments, appointments, payments and other health related services. *Id.* at ⁋⁋ 16, 24. Rush actively encourages patients to use its web properties, including the MyChart patient portal. *Id.* at ⁋ 17. Plaintiffs Marguerite Kurowski and Brenda McClendon have been patients of Rush and have used the MyChart portal for five years or more. *Id.* at ⁋⁋ 8–9, 21.

The Complaint alleges, and Rush does not deny, that Rush uses third party source code from Facebook, Google, and others that discloses patient PHI[3] to Facebook, Google, and others without consent or authorization. *Id.* at ⁋⁋ 20, 143–154. Worse still, Rush discloses its patients' PHI despite its false promises and assurances of confidentiality to Plaintiffs and other patients,

[3] Notably, Illinois and federal law use the same definition of PHI as it relates to HIPAA-covered entities, like Rush. 45 C.F.R. § 164.514; 410 ILCS § 513/10.

including its false claim that it "do[es] not share information collected through the website with any third-party advertisers." *Id.* at ¶¶ 157–173. That claim was never true.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), plaintiffs need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A claim has "facial plausibility" when its "factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept as true all of the allegations contained in [the] complaint," *id.*, construe those allegations "in the light most favorable to the plaintiff," and draw "all possible inferences in [the plaintiff's] favor," *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

## ARGUMENT

### I. THE COMPLAINT STATES A CLAIM UNDER THE FEDERAL WIRETAP ACT

#### A. Rush "Intercepted" Plaintiffs' Communications

Rush's primary argument to avoid liability under the Wiretap Act is it "cannot intercept communications for which Rush was the intended recipient." MTD at 5. This is incorrect under Seventh Circuit precedent. Rush, apparently recognizing this, relies solely on Missouri, New Jersey, Alabama, and other irrelevant out-of-circuit authorities to buttress its strawman argument.

##### *1. The Seventh Circuit Permits Claims Against Parties That Secretly Duplicated and Forwarded Communications*

The Seventh Circuit allows Wiretap Act claims where the intended recipient "permit[ed] an entity to engage in the unauthorized duplication and forwarding of unknowing users' information." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020)

(summarizing Seventh Circuit law).[4] In *Facebook Internet Tracking*, the Ninth Circuit aptly joined the reasoning of the Seventh Circuit's decision in *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010), stating:

> We adopt the First and Seventh Circuits' understanding that ***simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception***. As we have previously held, the "paramount objective of the [Electronic Communications Privacy Act, which amended the Wiretap Act] is to protect effectively the privacy of communications." *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013). ***We also recognize that the Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or "an unseen auditor."*** *See* S. Rep. No. 90-1097, reprinted in 1986 U.S.C.C.A.N. 2112, 2154, 2182. ***Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule***. (emphasis added).

The conduct described in Plaintiffs' Complaint falls squarely within the rule articulated in *Szymuszkiewicz* and *Facebook Internet Tracking*. Rush deployed third party source code on its web properties which caused the unauthorized redirection of patients' information to Facebook, Google, and others. *Szymuszkiewicz*, 622 F.3d at 706 (holding that "the duplication and forwarding" of content violates the Wiretap Act).[5] Rush cannot invoke the party exception.

---

[4] In this same opinion, the Ninth Circuit expressly declined to follow a pair of Third Circuit cases relied on by Rush, *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 142-43 (3d Cir. 2015) and *In re Nickelodeon Consumer Priv. Litig*., 827 F.3d 262, 274 (3d Cir. 2016), explaining that they contradict the weight of authority, including specifically Seventh Circuit precedent. *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d at 608. Rush claims *Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001) supports its claim that the intended recipient of a communication cannot be held accountable under the Wiretap Act. MTD at 6. But that case is irrelevant. It is a Northern District of California case that preceded the Ninth Circuit's decision in *In re Facebook, Inc. Internet Tracking Litig.* Today, the Northern District of California would be forced to decide *Crowley* differently based on the Ninth Circuit's holding, which is binding on it.

[5] The unreported District of New Jersey decision Rush cites is *dicta*, as it was decided based on waiver. *Allen v. Quicken Loans Inc.*, No. CV1712352ESMAH, 2018 WL 5874088, at *4 (D.N.J. Nov. 9, 2018) ("Allen waived any argument to the contrary by failing to respond to Defendants' arguments in his brief."). More importantly, *Allen* directly conflicts with the Seventh Circuit's decision in *Szymuszkiewicz* and, of course, this Court is bound to follow Seventh Circuit law—not New Jersey. Even other courts *in New Jersey* have refused to follow *Allen*. *See e.g., White v. Samsung Elecs. Am., Inc.*, No. CV 17-1775, 2019

### 2. *Rush Had a Criminal or Tortious Purpose in Wiretapping Plaintiffs*

But even if *Szymuszkiewicz* were not dispositive (it is), it still would not matter because Rush's conduct also falls within the "criminal or tortious" "exception to the exception" found in § 2511(2)(d). That section states:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception ***unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State***.

*Id*. (emphasis added). Courts have interpreted the "criminal or tortious purpose" provision in § 2511(2)(d) to prohibit wiretaps which were conducted with a criminal or tortious purpose beyond the intent to commit a wiretap violation itself. The bar is easily met in this case.

Rush does not dispute that it intercepted its patients' PHI for commercial marketing purposes without HIPAA consent. Nor could it, given that the third-party source code it deployed on its web properties is designed for commercial marketing. Compl. at ¶¶ 74–77, 89, 92–102, 105–108, 122, 143–146. This is significant because it is a federal crime to "knowingly" disclose "individually identifiable health information" to third parties for "commercial" reasons.[6] 42 U.S.C. § 1320d-6. While Rush has not been *charged* with a crime, that is irrelevant. The only relevant issue is whether Plaintiffs adequately pled a tortious or criminal purpose—not whether a crime has been charged or a conviction obtained. *Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014) ("[J]ust because the government had not yet indicted does not mean that we must

WL 8886485, at *6 (D.N.J. Aug. 21, 2019) ("Defendants' argument that they were parties to these communications is unavailing.").

[6] Notably, "covered entities . . . may be prosecuted directly under 42 U.S.C. § 1320d-6" and "the 'knowingly' element of the offense set forth in that provision requires only proof of knowledge of the facts that constitute the offense." www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/17/-hipaa_final.htm.

assume—contrary to the circumstances of the seizure and testing—that one was not contemplated."); *see also Steele v. Life Ins. Co. of N. Am.*, 507 F.3d 593, 597 (7th Cir. 2007).[7]

Further, recent HHS guidance on the technology at issue here states that commercial tracking and analytics technologies (including Google Analytics and the Meta Pixel) that disclose patient PHI violate HIPAA under § 2511(d)(2):

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Guidance") (emphasis in original).

Finally, Rush's own authorities agree with this analysis. *In re Google Inc. Cookie Placement Consumer Privacy Litig.* held that "all authority of which we are aware indicates that the criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal ***use*** of the interception's fruits." 806 F.3d 125, 145 (3d Cir. 2015) (emphasis added). Here, Rush did not just intend to intercept Plaintiffs' communication, but it also tortiously and criminally used them for commercial purposes in violation of HIPAA. Compl. at ¶¶ 74–77, 89, 92–102, 105–108, 122, 143–146.

Therefore, whether the Court applies the rule in *Szymuszkiewicz* or the "exception to the exception" under §2511(d)(2), Rush's "intended recipient" argument fails as a matter of law.

---

[7] Even Rush's counsel apparently shares OCR's concern that HIPAA violations may result in prosecution and issued a warning that "voluntarily disclosing PHI to law enforcement could violate the Privacy Rule and result in criminal prosecution." BakerHostetler, Office for Civil Rights Provides Guidance: HIPAA Privacy Rule on Disclosures of Information Relating to Reproductive Healthcare (available at https://www.bakerdatacounsel.com/data-privacy/office-for-civil-rights-provides-hipaa-privacy-rule-on-disclosures-of-information-relating-to-reproductive-healthcare/).

### B. Rush Acts as an "Electronic Communication Service" by Providing the Patient Portal

Plaintiffs adequately allege that Defendant Rush is an "electronic communications service" within the meaning of the ECPA because it gives patients the ability to communicate with their doctors directly online through an access-restricted messaging service. Compl. ¶¶ 21–24. These are the same two criteria used by Judge Durkin in *Pascal Pour Elle, Ltd. v. Jin*, 75 F. Supp. 3d 782 (N.D. Ill. 2014). There, the Court held the plaintiff adequately alleged a "salon management" service with an "online portal" was an electronic communications service under the ECPA.[8] *Id.* at 784, 788. The Court based this decision on the plaintiff's claim that the salon provided a restricted access communication service which "provides its users with an email and text messaging function." *Id.* at 788. Plaintiffs make identical allegations about Defendant's online portal. (Compl. ¶¶ 21–24 (alleging Defendant's portal permits patients to create private accounts, as well as send and receive messages)). Therefore, they have sufficiently alleged Defendant is an electronic communications service under the ECPA.

Defendant's strawman cases are not to the contrary. Rather, they merely stand for the irrelevant proposition that companies which provide products over the internet without providing communications services are not "electronic communication services." *See e.g., Garner v. Amazon.com, Inc.*, No. C21-0750RSL, 2022 WL 1443680, at *11 (W.D. Wash. May 6, 2022) ("A company that merely utilizes electronic communications in the conduct of its own business is generally considered a purchaser or user of the communications platform, not the provider of the service to the public.") This is neither surprising nor Plaintiffs' position. Rush did not merely sell shoes over the internet. It provided a communications messaging system through which users

[8] Although *Pascal* concerned Title II of the ECPA, and this case concerns Title I, the definition of "electronic communications service" applicable to both is the same. 18 U.S.C. § 2510 (defining "electronic communications service"); 18 U.S.C. § 2711 (adopting § 2510's definitions).

could communicate with one another. This conduct makes Rush an electronic communications service by the plain text of the statute.

### C. Plaintiffs Allege Rush Disclosed the Contents of Their Communications

Rush is incorrect in claiming that "Plaintiffs' complaint does not allege any transfer of internet metadata specific as to them, personally." MTD at 1, 8–9. The information at issue is patient PHI under HIPAA—not "metadata." While Rush may refer to its patients' personal health information as "metadata" that description is incorrect.

Regardless, the Complaint specifically alleges that Plaintiffs communicated via the web properties and even describes the nature of the communications:

- "Plaintiffs exchanged communications with Rush via the Rush web property, including using Rush's MyChart patient portal, identifying themselves to Rush as a patient, and exchanging communications relating to their particular providers and medical conditions." *Id.* ¶ 22.

- "Plaintiffs exchanged communications with Rush through its web properties, including through the MyChart patient portal, each time Plaintiffs used the MyChart patient portal or other Rush web properties." *Id.* ¶ 32.

- Plaintiff Kurowski "has been a Rush patient since approximately 2017 and has been a MyChart patient portal user since 2017." *Id.* ¶ 8.

- Plaintiff McClendon "has been a Rush patient since approximately 1999 and has been a MyChart patient portal user since 2017." *Id.* ¶ 9.

Plaintiffs further provided exemplar screen shots of the precise *contents* of the communications that were transmitted to third parties. For example, Plaintiffs provided a screen shot of the transmission to Facebook when patients, including Plaintiffs, clicked to log in to their portal accounts which included, not just the literal contents of the button they clicked (*i.e.* "Login to MyChart"), but also all of the contextual information for the communication, including the button's feature, the page's features, and referrer information. Compl. ¶ 92. Of course, what Plaintiffs did *not* do is include screenshots of their historical communications that took place

before Rush's conduct was discovered. Not only would this be an impossible feat given that client-side network traffic captures must be obtained contemporaneously with the communications, but more fundamentally, disclosing the contents of Plaintiffs' "private" communications in the Complaint would only compound the violation of their medical privacy.

In any event, every Court to consider the adequacy of these allegations has found for the plaintiff. Courts around the country considering nearly identical allegations have held them to be sufficiently pled. *See, e.g.*, *Doe v. Universal Hosps. Health Sys., Inc.*, No. CV-20-933357, Order Denying Defendant's Motion to Dismiss, (Ohio C.P. Nov. 16, 2020) (Ex. 3) ("Plaintiff pleads that she is a patient of University Hospitals who communicated with the hospital through its website about specific conditions, appointments, and providers. Similarly, she alleges that she exchanged communications with the hospital through the patient portal. Although she fails to identify specific protected information or data allegedly disclosed to third parties, one may fairly infer from the allegations of the complaint that transmission of [her] private data is at least plausible.") (internal citations omitted). The result is the same under Illinois law. *Henry v. Teletrack, Inc.*, No. 11-CV-4424, 2012 WL 769763, at *1, *4 (N.D. Ill. Mar. 7, 2012) (plaintiffs were entitled to "reasonable inference" that Teletrack furnished their personal information to third parties where they alleged defendant sold "marketing lists" to third parties who used them to "solicit new customers," alleged they were "customers of Teletrack," and alleged they "received unsolicited phone calls from third parties presumed to be [other] customers of Teletrack").

## II. THE COMPLAINT STATES A CLAIM FOR BREACH OF THE IMPLIED DUTY OF CONFIDENTIALITY UNDER ILLINOIS LAW

Rush's defense to Plaintiffs' breach of the implied duty of confidentiality claim entirely misses the mark because it mischaracterizes or ignores much of Plaintiffs' allegations.

Most of Rush's motion serves only to confirm that the cause of action for Plaintiffs' breach of the implied duty of confidentiality has been supported under Illinois law for more than forty years. *Geisberger v. Willuhn*, 72 Ill.App.3d 435, 438 (2d Dist.1979) ("The cases that have recognized the contract theory as a cause of action make it clear that the action lies for the disclosure of 'personal' information, e.g., information relating to the patient's mental or physical condition."). In fact, Rush agrees that Plaintiffs' claim includes "disclosures that violate the statutory physician-patient privilege." MTD at 10.

Rush makes a single argument for the dismissal of Plaintiffs' claims on this background: that Plaintiffs are not "actual living beings" when communicating over the internet. Rush's odd if not absurd argument that the communications at issue are not protected because they were made through computers has no basis in law. The Court need not take Plaintiffs' word for it: HHS made this clear less than a month ago when it stated that the "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI)." HHS's bulletin also makes it clear that tracking on user-authenticated patient portals is prohibited by HIPAA. It states that "[t]racking technologies on a regulated entity's user-authenticated webpages generally have access to PHI," which "may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage." Notably, Plaintiffs specifically allege that Rush discloses communications between Plaintiffs and Rush related to Rush's user-authenticated MyChart communications system:

> [Rush] secretly deploy[s] Google source code throughout its web properties, ***including inside the MyChart patient portal***, that causes the contemporaneous unauthorized transmission of personally identifiable patient data and re-direction of the precise content of patient communications with Rush to be sent to Google

> whenever a Rush patient uses the Rush web properties, ***including the MyChart patient portal***. . . . Rush caused the contemporaneous unauthorized transmission of Plaintiffs' personally identifiable patient data and re-direction of the precise content of Plaintiffs' patient communications with Rush to be sent to Google ***whenever Plaintiffs used the Rush web properties, including the MyChart patient portal.***

Compl. ¶ 30–32 (emphasis added).

But even if HHS had not explicitly prohibited Rush's conduct it still would not matter because Rush created an expectation of privacy in its Notice of Privacy Practices. The notice says it applies to "all records regarding your care generated by Rush University Medical Center or Rush Oak Park Hospital, Inc. . . . whether made or received by our organization's personnel or given to others outside the organization for business purposes." *See* Compl. ¶ 172 (citing Notice of Privacy Practices). The notice promises to "maintain the privacy" of such information and further promises "not [to] sell your medical information or use or disclose your medical information for marketing without your prior written authorization." *Id.* Of course, none of this was true. Rush shared patient information with Facebook, Google, and other third parties in exchange for enhanced commercial marketing and analytics services.

Finally, other courts have found that, even in the context of retail purchases, communications are protected despite occurring over the internet. In *Revitch v. New Moosejaw, LLC*, the court explained that "an online patron" who "click[s] on items of interest" "undoubtedly communicates with the retailer." No. 18-CV-06827-VC, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 23, 2019). Rush's argument that Plaintiffs' communications are not protected because they occur over the internet and could have been made by a non-patient is antiquated and baseless.

## III. THE COMPLAINT STATES A CLAIM UNDER THE ILLINOIS DECEPTIVE AND UNFAIR PRACTICES CONSUMER FRAUD ACT

Plaintiffs have alleged all the elements of their ICFA claims, including personal deception and pecuniary loss. Moreover, Rush's arguments attempting to show that its data collection and

transmission practices were accurately disclosed on its website, actually proved the opposite: that the majority of the conduct described in the Complaint as forming the basis for Plaintiffs' claims was *not* disclosed, and even the disclosures that were made were highly misleading.

### A. Plaintiffs Allege Personal Deception

The Complaint alleges personal deception under Illinois law. Unlike the plaintiffs in the inapposite cases cited by Rush where the plaintiffs lacked a direct connection to the defendant or their deceptive statements, the Complaint here alleges that Plaintiffs were Rush patients at the time the statements were made; were encouraged by Rush to use and communicate through the MyPatient portal; and did in fact sign up for and use the MyChart portal for years pursuant to incomplete and misleading disclosures. Compl. ¶¶ 8–10, 22, 168–72, 214. Rush even includes as exhibits to its motion the very representations it claims to have communicated directly to Plaintiffs, and, as described further below, it implicitly admits it failed to disclose the vast majority of the improper data collection and transmissions alleged in the Complaint. *See infra* Section III.B; *see also* MTD Ex. B. That is more than sufficient to plead that Plaintiffs were personally deceived by Rush.

Rush's cases do not suggest otherwise. In *De Bouse v. Bayer*, plaintiff De Bouse brought an ICFA claim after defendant Bayer recalled a drug where she failed to allege any physical harm from the drug, claiming only economic damages to the market as a whole and offering no evidence that she was ever exposed to any of the drug's marketing. 235 Ill. 2d 544, 547 (2009). Notably, *De Bouse* was decided on summary judgment after the development of a full factual record regarding the misleading claims. Regardless, *De Bouse* is entirely inapplicable because the misleading claim at issue there occurred in advertising separate from the product whereas, here, Rush's deceit occurred on the web properties themselves, similar to the packaging of a retail product.

Similarly, in *Oliveira*, the plaintiff brought an ICFA claim for false advertising, but could not establish that he had been exposed to any of the advertising. *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 154–55, 776 N.E.2d 151, 163 (2002). By contrast, here, Plaintiffs allege that they had a direct, ongoing relationship with Rush for years, signed up for MyChart at Rush's behest pursuant to disclosures that Rush implicitly concedes do not cover most of the conduct alleged in the Complaint.

**B. Rush Implicitly Admits Its Website Does Not Disclose the Privacy Violations Here**

Strangely, Rush admits that it does *not* disclose the tracking and transmissions to Facebook and Bidtellect by arguing that it only discloses its use of Google analytics. Rush's patients have a right to understand and control who has access to their personal medical information and how it is used. Even assuming *arguendo* Rush's disclosures as to Google were adequate (which they were not, as discussed below), that actually makes the omissions as to Facebook and Bidtellect even worse because the implication is that Google is the only third party receiving Plaintiffs' personal data, when, in fact, it is not.

Moreover, Rush's website disclosures about Google cookies do not come close to disclosing the actual spying practices that are alleged in the Complaint. Cookies are just one of seven distinct categories of Plaintiffs' PII that are alleged to have been collected and sent to third parties without consent, in addition to (i) patient IP addresses, (ii) device identifiers, (iii) account numbers, (iv) URLs, (v) browser-fingerprints, and (vi) other unique identifying numbers, characteristics, or codes. Compl. ⁋⁋ 33, 28–29, 128–133. As with its inadequate disclosure of the third parties to whom it was sending patient data, Rush's woefully incomplete list of the kinds of data it was sending to Google actually cuts *against* its defense, because it misleads patients into a false belief that the scope of data collection and transmission is much narrower than it actually is,

even just with respect to Google. Similarly, the disclosures about disabling cookies that Rush claims are exculpatory are in fact incredibly deceptive, because they give patients a false sense of control. In fact, as alleged in the Complaint, cookies are only one of the seven categories of personal data transmitted, so the bulk of the data collection and transfer will not be impacted by cookie settings. *Id*.

Facebook and HHS agree that Rush's disclosures are inaccurate and ineffectual. First, Facebook has stated that its Pixel "partners" (*i.e.* Rush) are required to place a prominent notice that the Pixel is being used. *In re Meta Pixel Healthcare Litig.*, No. cv-22-03580-WHO (Nov. 9, 2022), 19:12–18 ("Meta requires web developers who use the pixel to post a prominent notice on every page where the pixel is embedded."). Rush has not placed any such notice on any page. Second, HHS has stated that "the Privacy Rule does ***not*** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures." HHS Guidance (emphasis in original). Thus, even if Rush had disclosed the third parties that it shares patient information with (it did not), that would have not been enough because covered entities cannot dispose of their patient obligations in purported "privacy policies."

Therefore, Rush's privacy policies are incomplete, deceptive, and ineffectual.

### C. Plaintiffs Allege Actual Pecuniary Loss

Even the case cited by Rush does not support its position. *Khorloo* involved only "*de minimis* privacy violations such as receipt of unwanted advertisements by text messages" and emphasized a flexible and broad approach to damages theories. *See Khorloo v. John C. Heath Att'y at L., PLLC,* No. 18-CV-01778, 2020 WL 1530735, at *2 (N.D. Ill. Mar. 31, 2020) ("Actual losses may come in several forms, including . . . being deprived of the benefit of the bargain."). Secretly sending private health information to third parties is not a "*de minimis* privacy violation." And

Plaintiffs plead the type of "benefit of the bargain" damages theory endorsed in *Khorloo*. Compl. ⁋ 7 (Plaintiffs did not get "full value of the medical services for which they paid").

## IV. PLAINTIFFS HAVE SATISFIED ALL ELEMENTS OF THEIR UNIFORM DECEPTIVE TRADE PRACTICES CLAIM

Plaintiffs adequately state a claim for damages and injunctive relief under the DTPA. Compl. ¶¶ 241–252. Defendant contends (1) the DTPA does not permit plaintiffs to recover damages and (2) Plaintiffs have alleged no future harm justifying injunctive relief. MTD at 16–18. Neither argument has merit.

First, the DTPA allows Plaintiffs to recover damages.[9] Damages are available for DTPA claims if they are raised alongside ICFA claims. *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1014 (N.D. Ill. 1993) ("[T]he Consumer Fraud and Deceptive Business Practices Act authorizes recovery of damages from violations of the Uniform Deceptive Trade Practices Act."); *Duncavage v. Allen*, 147 Ill. App. 3d 88, 102, 497 N.E.2d 433, 441 (1986) (plaintiffs alleging ICFA claims may "recover money damages for violations of the [DTPA]"). This is because the Illinois legislature crafted the DTPA and the ICFA "to provide consumers with protection that was broader than initially provided under either act individually." *Duncavage*, 147 Ill. App. 3d at 102, 497 N.E.2d at 441. Plaintiffs raise an ICFA claim alongside their DTPA claim. Compl. ¶¶ 219–240, 241–252. So, they can recover damages for Defendant's DTPA violations.

Defendant offers no compelling counterargument. It merely asserts that the DTPA, read in isolation, does not include a provision authorizing recovery of damages. MTD at 17 (claiming the "only permissible relief under the [DTPA] is for injunctive relief"). That is immaterial, for reasons already discussed. *Duncavage*, 147 Ill. App. 3d at 102, 497 N.E.2d at 441.

[9] Notably, even if the DTPA did not permit Plaintiffs to recover damages, that would not require the Court to dismiss their claim. Plaintiffs could still maintain their claim for injunctive relief. *See* 815 ILCS 510/3.

Second, in any event, Plaintiffs sufficiently allege a risk of future harm requiring injunctive relief. Plaintiffs can state the "future harm" element by alleging they "have no choice" but to either interrupt the "continuity of their medical care" or remain subject to a deceptive practice. *Forth v. Walgreen Co.*, No. 17-CV-2246, 2018 WL 1235015, at *14 (N.D. Ill. Mar. 9, 2018) (plaintiffs whose insurance made them fill prescriptions at Walgreens alleged future harm based on Walgreens' deceptive pricing practices).[10] That is precisely what Plaintiffs allege. Compl. ¶ 251 (explaining Plaintiffs "are patients of Rush and need access to Rush's web properties . . . in connection with receiving health care from Rush"). Hence, they have pleaded future harm.

Defendant's contrary argument fails. Defendant claims that Plaintiffs' "full knowledge" of its deceptive practices prevent them from alleging future harm. (Mot. at 17). True, consumers "aware of a deceptive practice" have more difficulty pleading future harm. *Forth*, 2018 WL 1235015, at *14. But that "general rule" exists because consumers informed of a deceptive practice can avoid it in the future. *Id.* It does not apply where, as here, "Plaintiffs plausibly allege that they will have no choice but to be injured in the future." *Id.*

## V. THE COMPLAINT STATES A CLAIM FOR INTRUSION UPON SECLUSION

Rush yet again mischaracterizes Plaintiffs' well-pleaded allegations in the Complaint to incorrectly arrive at its conclusion that "the basis for plaintiffs' claim is not any intrusion, but an alleged disclosure." MTD at 19. Rush is wrong on both the facts and the law.

*Both* the initial collection and the subsequent dissemination are alleged to have been conducted without Plaintiffs' knowledge or consent. *See, e.g.*, Compl. ⁋ 5 ("Rush systematically violated the medical privacy rights of its patients by causing the contemporaneous unauthorized ***interception and transmission*** of personally identifiable patient data . . . without patient

[10] *Forth* concerned out-of-state deceptive practices acts that mirror the DTPA. *Forth*, 2018 WL 1235015, at *13.

knowledge, consent, authorization, or any affirmative action.") (emphasis added); ⁋ 231 ("Rush's surreptitious ***collection and disclosure*** of Plaintiffs' and the Illinois Class members' personally identifiable data ….") (emphasis added).

Taking Plaintiffs' actual allegations into consideration, the cases relied upon by Rush actually support Plaintiffs' claims here, or are irrelevant. The primary case Rush relies on, *Dinerstein v. Google*, LLC, 484 F. Supp. 3d 561 (N.D. Ill. 2020), expressly did not reach any conclusions regarding Intrusion upon Seclusion because the plaintiff there "abandon[ed] his intrusion-upon-seclusion theory in his brief." *Id.* at 594. Moreover, that case was factually distinct because the action was against Google, not the hospital, and therefore is distinguishable for the same reason as *Smith v. Facebook*, i.e., the intrusion is by the party collecting the data, not the one receiving it. *See supra* Part I. Indeed, courts around the country routinely and perhaps universally find that a wiretap violation (and violations of other laws) gives rise to a claim for intrusion upon seclusion. *See LeCrone v. Ohio Bell Tel. Co.*, 201 N.E.2d 533 (Oh. App. 1963) (telephone co. liable for invasion of privacy by assisting husband by placing tap on wife's phone); *Hoskins v. Howard*, 971 P.2d 1135 (Id. 1998) (violation of state wiretap law gave rise to intrusion claim); *Clayton v. Richards*, 47 S.W.3d 149 (Tex. App. 2001) (finding actionable intrusion where unlawful wiretap alleged); *Nader v. Gen. Motors Corp*., 25 N.Y.2d 560 (1970) ("[T]o the extent the two challenged counts charge it with wiretapping and eavesdropping, an actionable invasion of privacy has been stated."); *Souder v. Pendleton Detectives*, 88 So.2d 716 (La. App. 1956) (actionable invasion of privacy where trespass alleged*); Latture v. Emmerling* (Mich. App. 2013) (actionable intrusion where defendant obtained access to email by "illegally" accessing school computer system); *Billings v. Atkinson*, 489 S.W.2d 858 (Tex. 1973) (adopting tort of intrusion in a wiretap case); *Ruzicka Elec. & Sons v. IBEW*, 427 F.3d 511 (8th Cir. 2005) (trespass gives rise to intrusion

claim); *Harkey v. Abate*, 346 N.W. 74 (Mich. App. 1983) (installation of viewing device actionable).

Defendant's remaining cases are no different. *Dwyer v. Am. Exp. Co*. concerned credit card companies that used cardholder information to "create a list of cardholders who have certain shopping tendencies" to sell to advertisers. 273 Ill. App. 3d 742, 747, 652 N.E.2d 1351, 1355 (1995). The court affirmed dismissal of the plaintiffs' intrusion upon seclusion claim only because the credit card companies did *not* give the advertisers the cardholder information they used to make the lists. *Id.* But at the same time the court implied that if the credit card companies *had* disclosed cardholders' sensitive information, they would have intruded upon cardholders' seclusion. *Id.* ("Defendants rent names and addresses after they create a list of cardholders who have certain shopping tendencies; they are not disclosing financial information about particular cardholders . . . Thus, we hold that the alleged actions here do not constitute an unreasonable intrusion into the seclusion of another."). Similarly, in *Miller v. Motorola, Inc*., the court the dismissed an employer's (not a healthcare provider's) disclosure to the plaintiff's co-workers that the plaintiff had a mastectomy because she had "voluntarily" provided information to her employer. 202 Ill. App. 3d at 981–82, 560 N.E.2d at 904. Thus, *Miller* is not relevant here.

## **<u>CONCLUSION</u>**

This is not a close case. None of Rush's arguments change the well-pleaded allegations that Rush collected Plaintiffs PHI through its website and MyChart portal, promised to keep that information confidential, and instead transmitted it to third parties for marketing purposes without Plaintiffs' consent. Those allegations satisfy the elements of each cause of action pled in the Complaint. This Court should reach the same conclusion that half a dozen other courts, and the HHS, have reached under the same exact facts, and deny Defendant Rush's motion to dismiss.

Dated: December 16, 2022

Respectfully Submitted,

*/s/ Corban Rhodes*

DICELLO LEVITT LLC
Adam J. Levitt
Amy E. Keller
Nada Djordjevic
Sharon Cruz
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
Fax.: (312) 253-1443
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
ndjordjevic@dicellolevitt.com
scruz@dicellolevitt.com

DICELLO LEVITT LLC
David A. Straite*
Corban Rhodes*
485 Lexington Ave., 10th Floor
New York, NY 10017
Tel.: (646) 933-1000
Fax.: (646) 494-9648
dstraite@dicellolevitt.com
crhodes@dicellolevitt.com

SIMMONS HANLY CONROY LLC
Jason 'Jay' Barnes*
112 Madison Ave., 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com

SIMMONS HANLEY CONROY LLC
Eric S. Johnson
Jennifer Marie Paulson*
One Court Street
Alton, IL 62002
Tel.: (618) 259-2222
ejohnson@simmonsfirm.com
jpaulson@simmonsfirm.com
* Appearing *pro hac vice*