**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARGUERITE KUROWSKI and BRENDA MCCLENDON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RUSH SYSTEM FOR HEALTH D/B/A RUSH UNIVERSITY SYSTEM FOR HEALTH,<br><br>Defendant. | CASE NO. 22 C 5380<br><br>HON. MATTHEW F. KENNELLY |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF PORTIONS OF THE COURT'S MARCH 3, 2023 MEMORANDUM OPINION AND ORDER**

Plaintiffs Marguerite Kurowski and Brenda McClendon respectfully move the Court, pursuant to Federal Rule of Civil Procedure 54(b), to reconsider or vacate the portions of the March 3, 2023 Memorandum Opinion and Order ("Order") (ECF No. 31) granting Defendant Rush System for Health's ("Rush") motion to dismiss Counts I, II, III, and V of the Complaint.[1]

## I. INTRODUCTION

Plaintiffs move to reconsider only a subset of the discrete issues on which the Court ruled in Rush's favor. Many of the authorities and arguments the Court relied on were raised or developed by Rush for the first time in its reply, with no opportunity for Plaintiffs to address them given the cancellation of oral argument. As discussed below, reconsideration is warranted here. [2]

## II. LEGAL STANDARD

Under Rule 54(b), any order "that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a [final] judgment." Fed. R. Civ. P. 54(b). Motions for reconsideration "generally 'serve the limited function of correcting manifest errors of law or fact." *Brownlee v. Cath. Charities of Archdiocese of Chicago*, 2022 WL 602535, at *2 (N.D. Ill. Mar. 1, 2022) (quoting *Slick v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 900, 902 (N.D. Ill. 2015)). Reconsideration is appropriate where the Court "has patently misunderstood a party," there has been "a significant change in the law or facts," or "the court "has made an error not of reasoning but of apprehension." *Brownlee*, 2022 WL 602535, at *2 (citations omitted); *Ellenby Techs., Inc. v. Fireking Sec. Grp.*, 533 F. Supp. 3d 656, 660 (N.D. Ill. 2021).

---

[1] Plaintiffs have contemporaneously filed a Motion for Leave to file a First Amended Complaint ("FAC") which, if granted, would render consideration of this Motion moot.

[2] Plaintiffs have nonetheless taken the Court's guidance to heart and have expanded on these allegations in the proposed FAC, filed concurrently with Plaintiffs' Motion for Leave to Amend and this Motion. The FAC makes it clearer that Rush's unauthorized conduct included activity inside the patient portal, when a patient signs-in or -out of the portal, when a patient requests an appointment, and any other connected activity or communications at the Rush web-properties. It also alleges facts demonstrating additional criminal or tortious conduct qualifying for the exception to the party exception in 18 U.S.C. § 2511(2)(d).

## III. ARGUMENT

### A. The Court Should Reconsider the Dismissal of Count I Because the Court's Findings, the Law, and the Existing Allegations Support Plaintiffs' Claims.

Count I of the Complaint is for violations of the federal Wiretap Act, 18 U.S.C. § 2511(a), (c)-(d) and § 2511(3)(a).[3] The Court based its dismissal of Count I on two findings: (1) that the guidance in the HHS Bulletin that the use of online tracking technologies by entities such as Rush violates HIPAA was prospective only such that the "criminal or tortious exception" to the party exception did not apply, and (2) that the allegations in the Complaint "appear to illustrate only what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website." Order at 10. Plaintiffs respectfully submit that the Court should reconsider the dismissal of Count I because (1) the DTPA claim that this Court upheld provides an alternate basis for applying the Wiretap Act's criminal or tortious exception to the party exception; (2) the finding that the HHS bulletin was prospective only is incorrect as a matter of fact and law, based on facts and arguments that were not before the Court; (3) even if the first finding is correct, that would merely shorten the Class period, not preclude Plaintiffs' claims; and (4) the second finding (that the Complaint is limited to Rush's "public website") reads the Complaint too narrowly.

#### 1. Plaintiffs' DTPA Claim, Which Was Upheld, Places Rush's Conduct Within the Crime/Tort Exception to the Wiretap Act's Party Exception.

The Wiretap Act prohibits a "party to the communication" from intercepting or acquiring the content of a communication "if the 'communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.' 18 U.S.C. § 2511(2)(d)." Order at 6. The "criminal or tortious" exception to the party exception to communications intercepted for the purpose of violating state law as well as

[3] Plaintiffs seek reconsideration of the Court's dismissal of Count I as to the alleged violations of 18 U.S.C. § 2511(1)(a), (c)-(d) but not as to the alleged violations of 18 U.S.C. § 2511(3)(a).

federal law. 18 U.S.C. § 2511(2)(d). Plaintiffs allege that "Rush's practice of disclosing patients' data without their knowledge or consent also violates the DTPA." Order at 17; Compl. ¶¶ 241-244. The Court denied Rush's motion to dismiss the DTPA claim; and Rush's violation of the DTPA puts Rush's conduct within the "crime or tortious exception" to the party exception.

2. The HHS Bulletin Does Not Only Apply Prospectively Because It Did Not Establish Any New Rules.

On December 1, 2022, the Office of Civil Rights at the Department of Health and Human Services issued a Bulletin titled "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," (the "HHS Bulletin") to "highlight the obligations" of HIPAA covered entities under the HIPAA Rules "when using online tracking technologies."[4] Rush argued, and the Court accepted, that it only applied prospectively. ECF No. 28, Reply at 4; Order at 10. However, HHS specified in the Bulletin that it was not announcing new law, rules, or policy, but was merely "*highlight[ing] the obligations*" of covered entities "under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") . . ."[5] This is important because the Seventh Circuit has held "[a] rule simply clarifying an unsettled or confusing area of the law, on the other hand, does not change the law, but restates what the law according to the agency is and has always been: It *is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand*." *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993) (quotation omitted; emphasis added).

There is no doubt HIPAA has always prohibited the types of conduct alleged in the Complaint. The HHS Bulletin explains: "While *it has always been* true that regulated entities may

[4] "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates" from the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS), last updated December 1, 2022. Available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[5] *Id*.

*not impermissibly disclose PHI to tracking technology vendors,* because of the proliferation of tracking technologies collecting sensitive information, *now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*"[6] The Bulletin also supports the various obligations discussed with citations to HIPAA final rules that have been in effect for years. For example, the Bulletin cites to "Modifications of the HIPAA [Rules], Final Rule," 78 FR 5566, 5598, from January 25, 2013, to support the statement:

> Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual provides when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code.All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.,* it isindicative that the individual has received or will receive health care services or benefits from the coveredentity), and thus relates to the individual's past, present, or future health or health care or payment for care.[7]

The 2013 Modifications were clear that "[P]rotected health information … may not necessarily include diagnosis-specific information … and may be limited to demographic or other information not indicative of the type of health care services provided to an individual;" and that information "tied to a covered entity" is "protected health information by definition since it is indicative that the individual received health care services of benefits from the covered entity."[8] Thus, the HHS Bulletin merely restates agency policy in a single place which has existed for the past two decades.

[6] *Id*. (emphasis added).
[7] *Id*.
[8] "Modification of the HIPAA [Rules], Final Rule," 78 FR 55666, 5598 (Jan. 25. 2013).

HHS has also consistently explained that patient-status and information that merely indicates patient-status, is protected. For example:

- In 2002, HHS explained that, "[t]he covered entity needs the individual's authorization to use or disclose protected health information for marketing communications, regardless of whether clinical information is to be used." 67 FR 53182, at 53189 (Aug. 14, 2002).
- In 2003, HHS stated that "covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list." HHS Marketing Guide: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003).
- In 2012, HHS stated that if "personal names, residential addresses, or phone numbers" were "listed with … an indication that the individual was treated at a certain clinic, then this information would be PHI." Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with [HIPAA] Privacy Rule at 5, available at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf. (Nov. 26, 2012).
- In 2013, HHS stated that it would violate HIPAA "if a covered entity impermissible disclosed a list of patient names, addresses, and hospital identification numbers." 78 FR 5642 (Jan. 25, 2013).
- In 2016, HHS issued guidance to app developers to help them determine if their app included "protected health information" under HIPAA. Available at: https://www.hhs.gov/sites/default/files/ocr-health-app-developer-scenarios-2-2016.pdf.

Against this backdrop of unbroken HHS policy prohibiting the conduct at issue in this case, agency statements which merely reiterate standing agency policy, are not properly analyzed as "prospective" or "retroactive" because they communicate *existing* policy. Therefore, since it has "always been true" that covered entities "may not impermissibly disclose PHI to tracking technology vendors," then Rush's obligation not to do so existed long before the HHS Bulletin.

This is the same rationale the court followed in *In re Meta Pixel Healthcare Litig.* ("*Meta Pixel*"), 2022 WL 17869218, at *8–9 (N.D. Cal. Dec. 22, 2022), issued after Plaintiffs filed their opposition brief (and which Rush omitted in its reply). *Meta Pixel* found that plaintiffs submitted evidence that hospitals transmitted individuals' patient status to Meta, in violation of HIPAA, based on allegations similar to those here. *See, e.g.*, Compl. ¶¶ 16, 21-22, 25, 29-38, 91-102:

> Plaintiffs have put forward evidence that the Pixel transmits "the patient status of individuals logging into the 'patient portals' of their providers through click data ****** Using the MedStar Health page as an example, this means that when a website user clicks on the "Log in" button on that webpage, the Pixel transmits: (1) the https://www.medstarhealth.org/mymedstar-patient-portal URL; (2) the content of the "Log in" button; (3) the destination URL (i.e. the URL of the webpage that the user is directed to after clicking the "Log in" button, which here is the patient portal); and (4) cookies which uniquely identify a Facebook user. See Smith Decl. ¶¶ 31–37.
>
> With the MedStar Health page as an example, I conclude that the Pixel transmits information showing patient status. That is, the act of clicking the "Log in" button, when coupled with the MedStar Health patient portal URL and the other information transmitted by the Pixel, sufficiently identifies the website user as a patient. ***

*Meta Pixel*, 2022 WL 17869218, at *8. In reaching this conclusion, the court relied, in part, on the HHS Bulletin's reiteration of HIPAA's long standing prohibitions:

> HIPAA defines "protected health information" as "individually identifiable" information that is "created or received by a health care provider" (or similar entities) that "[r]elates to the past, present, or future physical or mental health or condition of an individual" or the "provision of health care to an individual." 45 C.F.R. § 160.103.
>
> ---
>
> And the Department of Health and Human Services has issued guidance—including as recently as this past month—instructing that information which connects an individual with a healthcare provider "is indicative that the individual has received or will receive health care services," and thus "relates to the individual's past, present, or future health or health care or payment for care." *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, U.S. Health & Human Services (content current as of Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

*Id*.

The court explained:

> "[u]nlike the "general health information that is accessible to the public at large," the URLs and other information transmitted through the Pixel establish that a user is about to log in to a healthcare provider's website. Smith Decl. ¶¶ 31–37. Unlike in *Smith*, then, the Pixel captures information that connects a particular user to a particular healthcare provider—i.e., patient status—which falls within the ambit of information protected under HIPAA. … The act of navigating to a patient portal on a healthcare provider's website Is not the general internet browsing contemplated

> in *Smith*. As a result, *Smith* does not bear on the question of whether the information at issue here constitutes patient health information.

*Id*. at *9 (distinguishing *Smith v. Facebook*, 262 F. Supp. 3d 943 (N.D. Cal. 2017)); *see also U.S. v. Forrester*, 512 F.3d 500, 510 n.6 (9th Cir 2008) (explaining the contents of online searches are revealed through URLs). Likewise, in this case, Plaintiffs allege that the third-party source code Rush embedded in its web properties discloses the details of users' searches and actions, including the full URLs visited within Rush's website and the patient portal, to third parties in violation of long-standing HHS policy. *See* Compl. ¶¶ 29, 62–73, 84.

3. Applying the HHS Bulletin only prospectively shortens the class period but does not eliminate Plaintiffs' Wiretap Act Claims.

The Court found that "Kurowski remains a patient of Rush and thus must engage with Rush web properties to continue receiving medical care. Rush has not suggested that it has stopped its use of the alleged third-party source code that Kurowski alleges causes disclosure of her and other patients' private data." *Id.* at 18. Because Rush's disclosure of patient private data to third parties continued after the HHS Bulletin was issued, Rush's post December 1, 2022 conduct violated the guidance in the HHS Bulletin and therefore HIPAA, placing Rush's conduct squarely within the Wiretap Act's "crime or tortious exception" to the party exception. Applying the guidance in the HHS Bulletin only prospectively would merely shorten the class period, not absolve Rush entirely.

4. The Complaint includes allegations regarding what occurs when Rush patients use Rush's patient portal.

The allegations in the Complaint are also not limited to "what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website." Order at 10. Rush's web properties include Rush's MyChart patient portal. Compl. ¶¶ 16–17, 21–22; Order at 2 ("Rush maintains web properties for its patients to obtain information related to care at Rush and—at least with respect to MyChart—exchange communications about appointments, billing, test results,

prescription refills, and other treatment."). Although the examples in the Complaint of how Rush uses embedded third party code to transmit patient data to third parties without their consent focus on patient specific portions of Rush's public website, Plaintiffs also alleged that the same types of interceptions and transmissions, including of the contents of patient communications, occur when a patient logs-in to and uses Rush's MyChart patient portal:

> Rush uses the same tools and source code throughout its web properties, and the types of personally identifiable patient data and contents of patient communications contents Fiddler analysis determined were being transmitted to third parties without patient knowledge or authorization from the main www.rush.edu page, the Schedule Your Appointment Now link, and the birth control information page, are transmitted every time a Rush patient uses the Rush web properties, regardless of where the patient goes on the Rush websites.

Compl. ¶ 73. Regarding Google, Plaintiffs specifically alleged that Rush "knowingly and secretly deploy[ed] Google source code throughout its web properties, *including inside the MyChart patient portal*, that causes the contemporaneous unauthorized transmission of personally identifiable patient data and re-direction of the precise content of patient communications with Rush to be *sent to Google whenever a patient uses the Rush web properties, including the MyChart patient portal*." *Id*. ¶ 30 (emphasis added). [9]

---

[9] *See also* Compl. ¶¶ 91-92 ("Rush installed the Facebook Tracking Pixel to personally identify patients who click to log-in to Rush's patient portal at www.rush.edu," and "When a patient clicks the "MyChart" button at www.rush.edu, Rush uses the patient's personal identifiers by causing the identifiers to be transmitted to Facebook attached to the fact that the patient has exchanged a communication to log-in to the My Chart patient portal"), 94 ("Rush caused the patient's personal identifiers, including the patient's IP address, to be transmitted to Facebook attached to the fact that the patient has exchanged a communication with Rush to log-in to the My Chart patient portal"), 108 (same as to Bidtellect), 114 ("Whenever a Rush patient uses the Rush web properties, Rush uses and causes the disclosure of the patient's IP addresses to third parties with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the MyChart patient portal"), 126-127 (same as to "the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the MyChart patient portal," and "Rush's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Rush assigns to patients to be made to third parties"), 133 (same as to "the disclosure of data sufficient to form a browser-fingerprint with each re-directed communication described

Plaintiffs also allege that they are Rush patients who used Rush's website to create accounts on Rush's MyChart patient portal, and exchanged communications with Rush via Rush's MyChart patient portal, including identifying themselves to Rush as a patient, and exchanging communications relating to their particular providers and medical conditions. *Id*. ¶¶ 18, 21-22. And as the Court acknowledged, "Rush's MyChart patient portal, however, is available only to Rush patients," and "Rush maintains" MyChart "for its patients to obtain information related to care at Rush and … exchange communications about appointments, billing, test results, prescription refills, and other treatment." Order at 2. The Court also agreed with Plaintiffs' contention "that she has alleged sufficient facts to support an inference that, as a patient who was encouraged to sign up and utilize MyChart, she communicated with her provider on that platform and those communications were disclosed via third-party source code embedded within it." *Id.* at 11.[10] Communications about a Rush patient's providers, medical conditions, appointments, billing, test results, prescription refills, and treatment involve "the past, present, or future, physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual." *Id*. at 10 (quoting 43 U.S.C. § 1320(d)(6)). Kurowski, therefore, does "allege what surreptitious patient data disclosures occur when an actual Rush patient enters her MyChart portal and navigates through it." *Id*.[11] These same allegations "support an inference that Rush disclosed its patients' individually identifiable health information" as defined by HIPAA. *Id*. at 9.

---

herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the MyChart patient portal").

[10] The Court also acknowledged that "[O]ne may reasonably infer from [Plaintiffs'] allegations that transmission of her data via the third-party tracking source code is at least plausible." Order at 11 n.5.

[11] Although the current allegations are sufficient at this stage, Plaintiffs provide further details in their proposed Amended Complaint.

### B. The Court Should Reconsider Its Dismissal of Count II Because Plaintiffs Plausibly Allege Disclosures Related to the Provision of Health Care

Count II is a common law claim for breach of a healthcare provider's implied duty of confidentiality. The Court held that any cause of action in tort for breach of a health care provider's implied duty of confidentiality "is limited to disclosures that violate the statutory physician-patient privilege." Order at 13. Under Illinois law, "No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient." 735 ILCS § 5/8-802. In finding that Plaintiffs "fail[] to allege the disclosure of any information related to the provision of treatment to her and other similarly situated Rush patients" (Order at 13) the Court focused on the disclosures provided as examples in the Complaint. Plaintiffs, however, also alleged that the same types of interceptions and transmissions, including of the contents of patient communications, occur when a patient logs-in to and uses Rush's MyChart patient portal. *See, e.g.*, Compl. ¶ 73.

The Order further supports Plaintiffs' position, where the Court found "that she has alleged sufficient facts to support an inference that, as a patient who was encouraged to sign up and utilize MyChart, she communicated with her provider on that platform and those communications were disclosed via third-party source code embedded within it." Order at 11. Rush's MyChart patient portal "is available only to Rush patients." *Id.* at 2. And as the Court acknowledged, "Rush maintains web properties for its patients to obtain information related to care at Rush and—at least with respect to MyChart—exchange communications about appointments, billing, test results, prescription refills, and other treatment." Order at 2. Communications with one's provider via Rush's MyChart patient portal are classic examples of "information [the provider] may have

acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient."[12] 735 ILCS § 5/8-802.

Moreover, the Court should reconsider its dismissal of Count II because, as discussed in Section A.2. *supra*, the HHS Bulletin summarizes existing law and confirms that 'tracking on user-authenticated patient portals is prohibited by HIPAA;" and Rush's disclosure of patient private data to third parties continued after the HHS Bulletin was issued. Applying the Bulletin prospectively would merely shorten the class period, not absolve Rush entirely.

### C. The Court Should Reconsider the Dismissal of Count III Because Plaintiffs Have Pleaded Actual Damages In Support of Their ICFA Claim

Count III is for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), which the Court dismissed on the basis that Plaintiffs "failed to allege actual, pecuniary loss." Order at 16. The Court, however, acknowledged that benefit of the bargain damages may qualify as actual damages under the ICFA. *Id*. Plaintiffs allege that the full value of the medical care from Rush which Plaintiffs and other Rush patients paid for includes Rush's duty to maintain confidentiality of the data they provided to Rush. Compl. ¶ 7(d). And the Court itself recognized that Rush patients must interact with Rush's patient portal and other web properties as part of receiving medical services. Order at 18. Because Rush's patient portal is an integral part of receiving medical services from Rush, Rush's promise to maintain the confidentiality of patient data extends to the patient portal. Plaintiffs have, therefore, plausibly alleged that they overpaid for the medical services provided by Rush because Rush failed to provide the promised confidentiality for their data inside the patient portal, depriving them of the full benefit of their bargain with Rush. Compl. ¶¶ 7(d), 238. *See, e.g.*, *In re Yahoo! Inc. Customer Data Sec. Breach*

[12] Plaintiffs' proposed Amended Complaint, filed concurrently with this Motion, contains additional allegations relating to Rush's disclosure of information related to Plaintiffs' healthcare treatment.

*Litig.*, 313 F. Supp. 3d 1113, 1130 (N.D. Cal. 2018) (plaintiff sufficiently alleged that he "suffered benefit-of-the-bargain losses" where he paid for a "secure" service which "was not as secure as [defendant] represented."); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 992, 995 (N.D. Cal. 2016) (adopting "loss of benefit of the bargain" theory of "actual harm" for plaintiffs who alleged they contracted for "reasonable and adequate security measures" that defendant failed to deliver, causing plaintiffs to overpay for their health insurance).

Plaintiffs have also alleged that the personal data Rush transmits to third parties has a quantifiable cash value, that Rush, on information and belief, "was compensated for its disclosures of Plaintiffs' and Class members' personally identifiable patient data and communications by the third-party recipients in the form of enhanced marketing services or other compensation," but "Rush did not pay or offer to pay Plaintiffs or Class members for their communications or personally-identifiable patient data associated with these disclosures," and "profited from Plaintiffs' and Class members' information without ever intending to compensate Plaintiffs and Class members or inform them that the disclosures had been made." Compl. ¶¶ 134-141, 238.

Accordingly, Plaintiffs have alleged actual, pecuniary loss from Rush's ICFA violations.[13]

### D. The Court Should Reconsider the Dismissal of Count V Because Plaintiffs Have Plausibly Alleged Claims for Intrusion Upon Seclusion

Count V is a common law claim for intrusion on seclusion. The Court's finding that the patient data Plaintiffs alleged Rush disclosed "is not protected private health information" (Order at 20), is contrary to longstanding HIPPA definitions of what is considered protected health information, summarized in the Bulletin. The Court also focused on the conduct of the third parties whose source code Rush embedded in its web properties, rather than Rush's own acts which

[13] Additionally, Plaintiffs' proposed Amended Complaint contains additional allegations relating to benefit of the bargain damages.

intruded upon Plaintiffs' privacy, including Rush's placement of tracking tools on its patients' personal computing devices and deployment of source code that commanded those devices to take actions that were not authorized by the patient.

1. <u>The types of patient data Plaintiffs allege Rush collected without consent and provided to third parties for its own benefit fits readily into longstanding HIPAA definitions of protected health information.</u>

The following "identifiers of the individual or of relatives, employers, or household members of the individual" have been considered protected health information and individually identifiable health information under HIPAA since at least 2013:

A. Names; ….
E. Electronic mail addresses; ….
H. Medical record numbers; ….
J. Account numbers; ….
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristic, or code…;"

45 C.F.R. § 164.514 (amended June 7, 2013). These are the same types of patient data Plaintiffs allege Rush obtains by placing tracking technology on its web properties without patients' knowledge or consent. *See, e.g.*, Compl. ¶¶ 76-85 and 109-113 (IP addresses), 92-97 (unique identifiers), 116-118 (cookie identifiers). The Bulletin further confirms that the foregoing types of data are PHI, and that "[t]racking technologies on a regulated entity's user-authenticated webpages generally have access to PHI," which "may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[14] It further stresses that individually identifiable health information (IIHI) includes:

> "[A]n individual's IP address or geographic location, medical device IDs, or any unique identifying code;" and that "[a]ll such IIHI collected on a regulated entity's

[14] HHS Bulletin, *supra* note 4.

> website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[15]

"[W]hen a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care."[16]

2. <u>The alleged intrusion was perpetrated by Rush commanding patient computing devices to take actions without patient authorization</u>

The intrusion at issue was also directly perpetrated by Rush rather than something Rush simply allowed a third party to do. Order at 19 ("The question is therefore whether [Plaintiffs] ha[ve] alleged sufficient facts to allow an inference that Rush intruded upon its patient's seclusion when it allowed third-party source code to collect the data [Plaintiffs] allege[] it later disclosed."). Plaintiffs do not allege that Rush passively allowed a third party to intercept patient communications. Rush chose to place the offending source code at its own web properties. Rush then gained unauthorized access to patient computing devices by placing "first-party" cookies on each patients' computing device through a scheme that avoids any potential efforts to block tracking.[17] Compl. ¶¶ 38, 127. This "cookie synching" technique "cause[s] the disclosure of the first-party cookie values *that Rush assigns to patients* to be made to third parties." *Id.* ¶ 127. These actions alone give rise to the tort of intrusion upon seclusion regardless of any subsequent actions. *See, e.g.*, *Opal v. Cencom E 911*, 1994 WL 559040, at *5 (N.D. Ill. Oct. 5, 1994) ( "the placing of a recording device in an area where one has a reasonable expectation of privacy is, in itself, an

---

[15] *Id.*
[16] *Id.*
[17] Plaintiffs proposed Amended Complaint explains this process in further detail.

intrusion into that privacy. It is no different than opening the door to someone's house. Once open, the house, and all that goes on there, is exposed to the world whether anyone stops to listen or to look inside," whether or not the device actually recorded a communication); *Amati v. City of Woodstock*, *Ill.*, 829 F. Supp. 998, 1009-1010 (N.D. Ill. 1993) ("the nature of the tort depends on some type of highly offensive prying into the physical boundaries or affairs of another" and "placing [] a recording device in an area where one has a reasonable expectation of privacy is both intrusive and disruptive. In plain language, it ruins the privacy.").

Rush bugging its web properties and patients' browsers is no different than Rush tracking its patients' movements within its facilities and then sharing the patient's activities with a third-party. Here, the tort of intrusion upon seclusion is complete when Rush bugs the very web-properties, including the patient portal, through which it exchanges communications with patients. And if Rush's bugging of its own properties is not enough, it placement of cookies and commands to take over patient communications devices is enough to claim for intrusion upon seclusion.[18]

## IV. CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiffs' Motion for Reconsideration of Portions of the Court's March 3, 2023 Memorandum Opinion and Order and

---

[18] Courts have also routinely found that a wiretap violation (and violations of other laws) give rise to a claim for intrusion upon seclusion; and Plaintiffs have pleaded sufficient facts to support a wiretap claim. *See, e.g.*, *LeCrone v. Ohio Bell Tel. Co.*, 201 N.E.2d 533, 536-37 (Oh. App. 1963) (telephone company liable for invasion of privacy for assisting husband by placing tap on wife's phone); *Hoskins v. Howard*, 971 P.2d 1135, 1141-42 (Id. 1998) (violation of state wiretap law gave rise to intrusion claim); *Clayton v. Richards*, 47 S.W.3d 149, 155-56 (Tex. App. 2001) (finding actionable intrusion where unlawful wiretap alleged), *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569-70 (N.Y. App. 1970) ("[T]o the extent the two challenged counts charge it with wiretapping and eavesdropping, an actionable invasion of privacy has been stated."); *Souder v. Pendleton Detectives*, 88 So.2d 716, 718-19 (La. App. 1956) (actionable invasion of privacy where trespass alleged); *Latture v. Emmerling*, No. 304833, 2013 WL 5225243, at *4 (Mich. Ct. App. Sept. 17, 2013) (actionable intrusion where defendant obtained access to email by "illegally" accessing school computer system); *Ruzicka Elec. & Sons v. IBEW*, 427 F.3d 511, 524-25 (8th Cir. 2005) (trespass gives rise to intrusion claim); *Harkey v. Abate*, 131 Mich. App. 177, 181-83 (Mich. App. 1983) (installation of viewing device actionable).

reverse or vacate those portions of the Order granting Rush's motion to dismiss Counts I, II, III, and V of the Complaint.

Dated: March 28, 2023

Respectfully Submitted,

*/s/ Corban S. Rhodes*

DICELLO LEVITT LLC
Adam J. Levitt
Amy E. Keller
Nada Djordjevic
Sharon Cruz
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
Fax.: (312) 253-1443
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
ndjordjevic@dicellolevitt.com
scruz@dicellolevitt.com

DICELLO LEVITT LLC
David A. Straite*
Corban Rhodes*
485 Lexington Ave., 10th Floor
New York, NY 10017
Tel.: (646) 933-1000
Fax.: (646) 494-9648
dstraite@dicellolevitt.com
crhodes@dicellolevitt.com

SIMMONS HANLY CONROY LLC
Jason 'Jay' Barnes*
112 Madison Ave., 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com

SIMMONS HANLEY CONROY LLC
Eric S. Johnson
Jennifer Marie Paulson*
One Court Street
Alton, IL 62002

Tel.: (618) 259-2222
ejohnson@simmonsfirm.com
jpaulson@simmonsfirm.com
* Appearing *pro hac vice*