**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MARGUERITE KUROWSKI and BRENDA MCCLENDON, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

RUSH SYSTEM FOR HEALTH d/b/a RUSH UNIVERSITY SYSTEM FOR HEALTH,

*Defendant*.

Case No. 22 Civ. 5380 (MFK)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

THE FACTS OF THE COMPLAINT ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS ADEQUATELY ALLEGE CRIMINAL OR TORTIOUS PURPOSES ........ 2

A. *Desnick* Supports Applying the Exception to the Exception to Rush ........ 3

B. Plaintiffs Adequately Allege Plausible Criminal or Tortious Purposes ........ 4

C. Rush's Factual Defense Relating to Its Purported Purpose in Wiretapping Patients is Inappropriate Under 12(b)(6) ........ 8

II. PLAINTIFFS ADEQUATELY ALLEGE BREACH OF THE IMPLIED DUTY OF CONFIDENTIALITY ........ 9

III. PLAINTIFFS ADEQUATELY ALLEGE THEIR ICFA CLAIM ........ 11

IV. PLAINTIFFS ADEQUATELY ALLEGE INTRUSION BY RUSH ........ 13

V. PLAINTIFFS ADEQUATELY ALLEGE PUBLICITY ........ 14

VI. PLAINTIFFS ADEQUATELY ALLEGE TRESPASS TO COMPUTING DEVICES ........ 14

VII. PLAINTIFFS HAVE AN ACTION FOR BREACH OF CONTRACT ........ 15

VIII. PLAIINTIFFS' GOOD FAITH AND FAIR DEALING CLAIMS SHOULD BE CONSIDERED WITH THE CONTRACT ........ 17

IX. PLAINTIFFS ADEQUATELY ALLEGE DETRIMENT FOR QUASI-CONTRACT ........ 17

X. PLAINTIFFS ADEQUATELY ALLEGE RUSH IS A "PRINCIPAL" ........ 18

XI. PLAINTIFFS STILL HAVE A DECEPTIVE TRADE PRACTICES CLAIM ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

## Cases

*Biddle v. Warren Gen. Hosp.*,
715 N.E.2d 518 (Ohio 1999) ....... 9

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ....... 20

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ....... 3, 5

*Burns v. Masterbrand Cabinets, Inc.*,
369 Ill. App. 3d 1006 (2007) ....... 14

*CAIN, Inc. v. Gaubatz*,
123 F. Supp. 3d 83 (D.D.C. 2015) ....... 4, 8

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) ....... 4, 7

*Carpenter v. United States*,
484 U.S. 19 (1987) ....... 12

*Desnick v. ABC*,
44 F.3d 1345 (7th Cir. 1995) ....... 3, 4, 8

*Doe v. Meta*,
2022 WL 17869218 (N.D. Cal. Dec. 21, 2022) ....... 6, 8

*Doe v. Regents of Univ. of California*,
No. 23-CV-00598-WHO, 2023 WL 3316766 (N.D. Cal. May 8, 2023) ....... 10

*Doe v. Virginia Mason*,
2020 WL 1983046 (King Cty., Wash.) ....... 13

*Gubala v. Time Warner*,
846 F.3d 909 (7th Cir. 2017) ....... 13

*Hamberger v. Eastman*,
106 N.H. 107 (N.H. 1964) ....... 14

*Hawkins v. Capital Fitness, Inc.*,
2015 IL App. (1st) 133716 ....... 16

*Illinois Cent. R. Co. v. Commissioners of Hwys and Town of Mattoon*,
161 Ill. 247 (1896) ....... 12

*In re Anthem, Inc., Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) ....17

*In re Facebook, Cons. Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ....14

*In re Marriott Intl., Inc. Customer Data Security Breach Litig.*,
440 F.Supp.3d 447 (D. Md. 2020).... 12, 13

*Johnson v. Kmart Corp.*,
311 Ill. App.3d 573 (2000) ....14

*Labor Ready, Inc. v. Williams Staffing, LLC*,
149 F. Supp. 2d 398 (N.D. Ill. May 31, 2001) ....13

*Larsen v. Vic Tanny Intl.*,
130 Ill. App. 574 (1984)....15

*Little Co. of Mary Hosp. & Health Care Centers v. Shalala*,
994 F. Supp. 950 (N.D. Ill. 1998), *aff'd*, 165 F.3d 1162 (7th Cir. 1999)....10

*Manhattan Gen'l Equip. Co. v. Commissioner*,
297 U.S. 129 (1936) ....10

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*,
1997 WL 405908 (D. Ariz. Mar. 27, 1997) ....5

*Northern Trust Co. v. VII South Michigan Assoc.*,
276 Ill. App. 3d 355 (1995) ....17

*Ogbolumani v. Young*,
2015 IL App (1[st]) 141930-U....15

*Phillips v. Washington Legal Found.*,
524 U.S. 156 (1998)....17

*Planned Parenthood v. Center for Med. Progress*,
214 F. Supp. 3d 808 (N.D. Cal. 2016) ....7

*Pope v. Shalala*,
998 F.2d 473 (7th Cir.1993) ....10

*Rigney v. City of Chicago*,
102 Ill. 64 (1881)....12

*Scott & Fetzer Co. v. Montgomery Ward & Co.*,
112 Ill. 2d 378 (1986) ....16

*Scully v. Foster Wheeler Corp.*,
178 F.2d 170 (7th Cir. 1949) ........ 19

*Smith v. Facebook, Inc*,
745 F. App'x 8 (9th Cir. 2018) ........ 7

*Sotelo v. DirectRevenue, LLC*,
384 F. Supp. 2d 1219 (N.D. Ill. 2005) ........ 14, 15

*Thomas v. Pearl*,
998 F.2d 447 (7th Cir. 1993) ........ 7

*U.S. v. Concentrated Phosphate Export Ass'n*,
393 U.S. 199 (1968) ........ 20

*U.S. v. Gomez*,
712 F.3d 1146 (7th Cir. 2013) ........ 19

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........ 19

**Statutes**

18 Ill. Stat. § 5/14-1 ........ 18

18 U.S.C. § 2510 ........ 18

18 U.S.C. § 2511 ........ 3, 4, 5

42 U.S.C. § 1320d-6 ........ 5, 9

720 Ill. Stat. § 5/14-2 ........ 18

720 Ill. Stat. § 5/14-6 ........ 18

**Regulations**

45 C.F.R. § 164.508 ........ 9

75 F.R. 44368 ........ 16

75 F.R. 44369 ........ 16

**Other Authorities**

Restatement (Second) of Torts § 911 (1979) ........ 18

## INTRODUCTION

This case is about a healthcare provider's disclosure of *patient* personal health information to Facebook, Google, and others. Put simply, a healthcare provider may not share the contents of patients' communications and personal health information with third parties, for any purpose, without the patient's knowledge and authorization. This rule is ancient in origin and has survived the printing press, the telephone, and the Internet. Dkt. 46 ¶¶ 192-199. Indeed, the Office of Civil Rights at the United States Department of Health and Human Services (HHS) recently reminded health care providers that federal law has long prohibited the sharing of patient information for marketing purposes without express, written patient authorization. Dkt. 46 ¶¶ 148-191. Despite this long-standing prohibition, Rush System for Health ("Rush") placed invisible web-bugs and tracking tools on its patient portal and other web properties that (1) deposited unauthorized, persistent tracking "cookies" on patient communication devices by disguising them as belonging to Rush when, in fact, they were associated with Google and Facebook; and (2) re-directed patient identifiers and health-related communications content to Google and Facebook from inside and outside the Rush MyChart patient portal. Rush has now removed the source code from its properties. Dkt. 46 ¶ 4, n.1.

## THE FACTS OF THE COMPLAINT

Plaintiffs are patients of Rush, bringing claims on behalf of a class of fellow Rush patients, who have used the Rush properties at issue (including www.rush.edu and the MyChart patient portal at mychart.rush.edu) since at least 2017. Dkt. 46 ¶¶ 8-9. Rush encourages patients to exchange communications at the Rush properties. *Id.* ¶¶ 16-17. Patients have a reasonable expectation of privacy that Rush will not share their information or communications with third parties. *Id.* ¶¶ 6-20. These expectations are grounded in Rush's express and implied ethical and legal duties of confidentiality to patients, *Id.* ¶¶ 148-237, in addition to at least 37 express promises that Rush makes to its patients regarding the privacy and security of their information. *Id.* ¶ 237.

Despite its ethical and legal obligations and its express privacy promises, Rush bugged its own web-properties with source code from Google, Facebook, and others. Without any action by or authorization of patients, (1) Rush deposited Facebook and Google cookies on patients' computing devices by disguising them as first-party cookies; and (2) commanded patients' computing devices to contemporaneously redirect identifiers and communications to these third parties. Dkt. 46 ¶¶ 74, 78.

When a patient exchanged communications with Rush outside the patient portal about doctors, treatments, or conditions, Rush sent that content to Facebook and Google attached to specific identifiers. *See, e.g.,* Dkt. 46 ¶ 97. When a patient clicked to log-in to the patient portal, Rush re-directed those communications to Facebook and Google connected to the same identifiers. *Id.* ¶¶ 32, 56, 419. Once a patient was inside the Rush patient portal, Rush disclosed the patients' communications within the portal, and the same specific identifiers, to Google. *Id.* The bugs that Rush places on its property and the re-directions are invisible by design. Dkt. 46 ¶ 74.

The identifiers that Rush re-directed to Facebook and Google include patient IP addresses; unique, persistent patient cookie identifiers; device identifiers; account numbers; URLs; other unique identifying numbers, characteristics, or codes; and browser-fingerprints. Dkt. 46 ¶ 35. All of these data points have long been considered individually identifiable as a matter of law under HIPAA. *Id.* ¶ 152 (citing 45 C.F.R. § 164.514). The communications "content" that Rush re-directed included information about the substance, purport, or meaning of communications that patients exchange with Rush inside and outside the Rush patient portal. *See, e.g., id.* ¶¶ 47 ("treatments/birth-control); 48 ("mychart/Authentication/Login); 67 ("I AM A … Patient"); 72; 73, and 204.

## ARGUMENT

## I. PLAINTIFFS ADEQUATELY ALLEGE CRIMINAL OR TORTIOUS PURPOSES

Rush's only argument for dismissing Plaintiff's Wiretap claim (Count I) is that it did not act with a criminal or tortious purpose when it wiretapped Plaintiffs. Plaintiffs agree with Rush that

*Desnick v. ABC*, 44 F.3d 1345 (7th Cir. 1995) set the standard for interpreting the 18 U.S.C. § 2511(2)(d) "exception to the exception." However, *Desnick* supports Plaintiffs' position and, in any event, demonstrates Rush is asserting a factual defense inappropriate on a Rule 12(b)(6) motion.

### A. *Desnick* Supports Applying the Exception to the Exception to Rush

In *Desnick*, the Seventh Circuit outlined the two-step process for determining the applicability of § 2511(2)(d). First, the Court must identify the intended purpose of a recording at issue, then it must determine whether that purpose is tortious or criminal. *Desnick*, 44 F.3d at 1353. Normally, determining the purpose is a factual issue inappropriate for consideration under 12(b)(6). *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021). However, in *Desnick*, there was no dispute that the defendant's intended purpose in recording the employees was "to see whether the Center's physicians would recommend cataract surgery on the testers." 44 F.3d at 1353. That is, the plaintiffs did not allege a tortious purpose such as "the defendants infringed copyright [by showing the videotape without authorization], cast the plaintiffs in a false light, or otherwise invaded a right." *Id.* at 1349. Nor were the interests protected by trespass and the right to privacy—as at issue here—implicated because there were no "invasion of a person's private space," "embarrassingly intimate details of anyone's life . . . publicized," "eavesdropping on a private conversation;" nor "violation of the doctor-patient privilege" alleged. *Id.* at 1353. Thus, there was no tortious intent where "no intimate personal facts concerning the two individual plaintiffs … were revealed" and no "intrusion into legitimately private activities, such as phone conversations." *Id.*

As a result of not being able to show a tortious purpose at the time of the recording, the plaintiffs in *Desnick* moved the goal posts and attempted to attribute the subsequent unplanned alleged defamatory use of the recordings to their original intended purpose. The Court rejected this, finding only the intended purpose at the time of the recording governed the applicability of § 2511(2)(d) and, because the original intended reporting purpose was permitted, the exception to the exception did not

apply. *Id.* at 1353. Here, it cannot be disputed that Rush wiretapped patients for the purpose of providing information to Facebook and Google. Dkt. No. 50 at 4. Indeed, the entire purpose of deploying the tracking tools is to transmit patient communications and PHI back to those companies. Thus, the only issue here under *Desnick* is whether that undisputed purpose is criminal or tortious.

**B. Plaintiffs Adequately Allege Plausible Criminal or Tortious Purposes**

Unlike *Desnick,* which involved legal reporting practices specifically intended to be protected by the ECPA, this case involves a HIPAA-covered healthcare provider disclosing patient[1] communications and PHI to Facebook, Google, and others, *i.e.*, conduct explicitly prohibited. These intended, unauthorized third-party disclosures give rise to at least five bases for § 2511(2)(d).

*First*, the Court already found Plaintiffs adequately alleged a claim for injunctive relief under the Illinois Deceptive Trade Practices Act. Dkt. 31 at 16-17. Of course, the central premise of this claim is "Rush's practice of disclosing Plaintiffs' and Illinois Class members' personally identifiable data and re-directing their communications to third parties without authorization, consent, or knowledge." Dkt. No. 46 at ¶¶ 341-343. Thus, the DTPA violation also satisfies the exception-to-the-exception because the conduct which gives rise to the claim matches the intended purpose for the interceptions. Regardless, Rush's discontinuation of its tortious conduct does not preclude the applicability of § 2511(2)(d) because the inquiry is whether Rush acted with a tortious purpose at the time of its interceptions. *CAIN, Inc. v. Gaubatz*, 123 F. Supp. 3d 83, 85–86 (D.D.C. 2015) (whether § 2511(2)(d) applies "depends on the interceptor's intentions *ex ante*—not on whether, *ex post*, any injury actually occurred."); *Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010) ("At the time of the recording the offender must intend to use the recording to commit a criminal or tortious act.").

---

[1] Rush makes much of what occurs when non-patients visit its website. However, this case is brought *by Rush patients*, on behalf of a *patient class*, to which Rush owes duties not owed to the public.

*Second*, the FAC details Rush's surreptitious placement of Google and Facebook cookies on patient communication devices by disguising the cookies as Rush's own. *See* Dkt. 46 ¶ 420. This constitutes an additional tortious purpose—an actionable trespass to chattels, as discussed in Section IV below. *Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 1997 WL 405908, at *2 (D. Ariz. Mar. 27, 1997) (finding trespass and theft of trade secrets invoked § 2511(2)(d) and noting because "*Desnick* plaintiffs failed to allege theft of trade secrets, eavesdropping on private conversations, or other forms of trespass, the court dismissed their state law cause of action for trespass.").

*Third*, the FAC details Rush's violations of Illinois computer crime laws. Dkt. 46 ¶¶ 306-311. Other courts have found tortious or criminal intent is adequately alleged via a defendant's alleged subsequent disclosures or violations of analogous state laws. *See Brown*, 525 F. Supp. 3d at 1067 ("Plaintiffs have adequately alleged that Google's association of their data with preexisting user profiles violated state law, including CDAFA, intrusion upon seclusion, and invasion of privacy.").

*Fourth,* the FAC adequately alleges Rush's conduct violated 42 U.S.C. § 1320d-6(a)(3), which provides criminal and civil penalties against a healthcare provider who "knowingly . . . discloses individually identifiable health information to another person." In December 2022, HHS issued a bulletin (the "Bulletin") reminding healthcare providers that the HIPAA rules apply to online tracking technologies. Dkt. 46 ¶¶ 161-165. The Bulletin explains HIPAA's prohibitions against the disclosure of health information apply to Google and Facebook "tracking on user-authenticated webpages . . . such as a patient . . . portal" and "unauthenticated webpages [such as] [t]he login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage [or pages] that address[] specific symptoms or health conditions . . . or that permit individuals to search for doctors or schedule appointments without entering credentials[.]" *Id*. It further explains that "IIHI" (including IP addresses, device IDs, and unique identifying codes):

> collected on a regulated entity's website. . .is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP

> address . . . does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e. it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

*Id.* ¶ 162 (quoting the Bulletin).

Contrary to Rush's assertions (Dkt. 50 at 6), the HHS guidance was not new. "[I]t has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors." Dkt. 46 ¶ 169. Instead, the Bulletin reflects the application of the plain text of the HIPAA Privacy Rule and its underlying statute. *Id.* ¶¶ 148-191. Moreover, to support the Bulletin, HHS relied on 78 FR 5566, 5598, a rulemaking notice from January 25, 2013, which stated "protected health information . . . may not necessarily include diagnosis-specific information. . . . If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected . . . in accordance with the HIPAA rules." *Id.* ¶ 172. This rule is consistent with the statute and its interpretations by HHS dating back to at least 2000. *Id.* ¶¶ 173-182. The statute defines "individually identifiable health information" as:

> [A]ny information collected from an individual, that – (A) is created or received by a health care provider …; and (B) *relates to* the past, present or future physical or mental health or condition of an individual, *the provision of health care to an individual*, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6) (emphasis added).

Interpreting the same decades-old statute and rules (and the same recent Bulletin), Judge Orrick in the Northern District of California found the information at issue in this case was protected by HIPAA. *Doe v. Meta*, 2022 WL 17869218, at *8-9 (N.D. Cal. Dec. 21, 2022) (finding that HIPAA protects patient-status, rejecting application of *Smith v. Facebook*, and finding that "Meta has not

established consent to the conduct at issue.") Significantly, Judge Orrick's order came after *an evidentiary hearing* that included evidence of how the same technology works. Finally, even Google publicly warns healthcare providers that its tools are not appropriate for provider web-properties. *See* "HIPAA and Google Analytics," available at: https://support.google.com/analytics/answer/13297105?hl=en.

*Fifth*, Plaintiffs adequately allege torts of invasion of privacy and publication of private facts for Rush's premeditated *use* of the interceptions. Numerous courts have found that planned, subsequent disclosures of intercepted communications trigger § 2511(2)(d). *Planned Parenthood v. Center for Med. Progress*, 214 F.Supp.3d 808, 828 (N.D. Cal. 2016) (holding that "defendants' subsequent disclosures of the contents of the intercepted conversations for the alleged purpose of further invading the privacy of plaintiffs' staff satisfies" the exception); *Thomas v. Pearl*, 998 F.2d 447, 451 (7th Cir. 1993) (analyzing invasion of privacy-publication of private facts as a predicate tort for § 2511(2)(d)); *see also Caro v. Weintraub*, 618 F.3d 94, 101 (2d Cir. 2010).

Furthermore, Rush's reliance on *Smith v. Facebook, Inc*, 745 F. App'x 8 (9th Cir. 2018) (unreported) is entirely irrelevant here. This is a case about patients' interactions with their healthcare provider. *Smith* was brought by non-patients related to interactions with web properties not operated by HIPAA-covered entities, let alone their own healthcare provider. In fact, the Ninth Circuit noted as much in oral argument in the *Smith* case, stating the plaintiffs' real "beef" was "with the medical providers that ought not be putting this stuff out on Facebook where it can be shared and so obviously they've been dismissed for lack of personal jurisdiction, they can be sued elsewhere presumably."[2] Numerous other courts have also expressly rejected Rush's argument that *Smith* applies to claims against healthcare providers. *See* Dkts. 25-1 to 25-7. Plaintiffs are not aware of any court which has

[2] *See* https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000014448 at 6:42. *See also In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003) (wiretap claim involving interception of consumer Internet communications with prescription drug companies).

found that *Smith* applied to the type conduct at issue in this case. One court even found that *Smith* did not apply to *Facebook's own current conduct*. *Meta*, 2022 WL 17869218 at *9.

Finally, although the web-property www.rush.edu may be publicly accessible, the existence and content of specific patients' communications with Rush are not. In addition to sending the identifiers for all patients and their respective devices, Rush also placed a tracking bug on patient communications devices and re-directed to Google and Facebook the content of patient communications, including when they signed-in or -out of the patient portal, and, in Google's case, what they did inside the patient portal. Dkt. 46 ¶ 419. In an analogous context, it would be as if Rush disclosed a list of all phone numbers that dialed Rush's publicly available phone number, along with the subjects of the calls, and whether the caller was a patient, and disclosed the list to Facebook and Google for marketing. Similarly, Rush's physical facilities have areas accessible to the general public, but Rush still cannot legally send Google or Facebook a list of all persons who entered its facilities, whether those persons were patients, and the subjects of communications that those persons had with Rush inside the facilities. There is no substantive difference here. The Internet may have changed Rush's business practices, but it did not nullify its duties of confidentiality to patients.

### C. Rush's Factual Defense Relating to Its Purported Purpose in Wiretapping Patients is Inappropriate Under 12(b)(6)

Finally, Rush's argument that its purported purpose in wiretapping its patients was "not to commit any crime or tort, but to speak better to them" is a factual defense—albeit without any evidentiary support—inappropriate for disposition under Rule 12(b)(6). The Seventh Circuit affirmed the result in *Desnick* because there was no factual dispute as to what the defendant's purpose was in wiretapping the plaintiffs. *Desnick*, 44 F.3d at 1353. Any factual dispute regarding Rush's purpose in wiretapping its patients can only be resolved by a jury, not under Rule 12(b)(6). *CAIR*, 31 F. Supp. 3d at 261 (denying *summary judgment* under § 2511(2)(d), finding: "The question of whether [the defendant] understood himself to be bound by and violating a duty of confidentiality and non-disclosure in

recording conversations from Plaintiffs' offices is a factual dispute appropriately resolved by a jury. If he did, his interception of conversations at [the plaintiff's offices], even in cases where he was party to the conversation, would not be protected by the one-party consent rule."). Regardless, Rush's evidence-free claim does not dispute the FAC's allegations that Rush knowingly and secretly deposits Facebook and Google tracking tools on patient communications devices and re-directed patient identifiers and communications content to those same companies.

Rush's focus on the "analytics" aspect of these tools ignores two points. *First*, these are marketing tools that involve Rush disclosing and providing Google and Facebook access to real-time patient data in exchange for enhanced marketing services and commercial advantage. Dkt 46 ¶ 305. That is a sale of patient information under HIPAA subject to enhanced consent requirements and criminal penalties. *See* 45 C.F.R. § 164.508(a)(3)-(4) (requiring express notice of "remuneration" where PHI used for "marketing" or "sale"); 42 U.S.C. § 1320d-6(b)(3) (enhanced criminal penalty for "intent to sell, transfer or use" IIHI "for commercial advantage, personal gain, or malicious harm"). *Second*, Rush's conduct is tortious and criminal regardless of whether Rush proclaims to have its patients' best interests at heart. As the Ohio Supreme Court put it:

> There may be special situations where the interests of the patient will justify the creation of a privilege to disclose. However, the only interest that has been recognized in this regard is the patient's interest in obtaining medical care and treatment, and disclosure is limited to those who have a legitimate interest in the patient's health. …. Otherwise, it is for the patient—not some medical practitioner, lawyer, or court—to determine what the patient's interests are with regard to personal confidential medical information.

*Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 528 (Ohio 1999). Simply stated, a healthcare provider cannot substitute its own judgment for the express authorization of its patient.

## II. PLAINTIFFS ADEQUATELY ALLEGE BREACH OF THE IMPLIED DUTY OF CONFIDENTIALITY

Rush argues that "plaintiffs have not alleged any particular health or treatment information disclosure specific as to them that Rush allegedly made to any third-party . . ." Dkt. 50 at 5. This is

incorrect. On a motion to dismiss, Plaintiffs are entitled to every reasonable inference. Here, they have alleged they used Rush's web-properties, including the patient portal, where it is undisputed Rush deployed tracking source code configured to secretly disclose patient information to Facebook and Google—including logging in to the patient portal; exchanging communications inside the patient portal; and exchanging substantive communications outside the patient portal. Dkt. 46 ¶ 32. Another Court considering this identical issue in the context of the California state HIPAA analog found allegations like those here were sufficient. *Doe v. Regents of Univ. of California*, No. 23-CV-00598-WHO, 2023 WL 3316766, at *4 (N.D. Cal. May 8, 2023) ("[The defendant] claims that plaintiff should have pleaded 'facts showing what specific medical information was entered by Plaintiff and which of that alleged medical information actually was transmitted to Meta and in what form. . . . At the motion to dismiss stage, it is not necessary for plaintiff to provide more specific medical details."). Moreover, Rush's argument asks the Court to require Plaintiffs to publicly disclose the contents of their specific health communications to hold Rush accountable for sharing that same information with third parties.

Moreover, Rush is incorrect to suggest the Bulletin only applies prospectively. An agency's interpretation of a statute "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." *Manhattan Gen'l Equip. Co. v. Commissioner*, 297 U.S. 129, 135 (1936); *see also Little Co. of Mary Hosp. & Health Care Centers v. Shalala*, 994 F. Supp. 950, 957 (N.D. Ill. 1998), *aff'd*, 165 F.3d 1162 (7th Cir. 1999) ("[A]gency rules that merely interpret or clarify, as opposed to effecting a substantive change in, existing law are properly applicable to disputes that arose before they were promulgated."); *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir.1993) (holding that a regulation "simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been."). HIPAA—and every HHS interpretation of the statute—has always protected patient status and communications with providers. The Bulletin was not a new interpretation affecting substantive rights, but simply a reminder

of long-standing law. It would be a perverse result for Rush to escape responsibility for long-prohibited conduct just because HHS had to publicly remind Rush of its obligations.

Further, Rush's citation to a June 29, 2022 HHS bulletin actually proves Plaintiffs' point. First, it's important to note that, "[o]n the heels of the Supreme Court ruling in *Dobbs vs. Jackson Women's Health Organization*," HHS issued **two** June 2022 bulletins.[3] The first, "[r]eminds HIPAA covered entities and business associates that they can use and disclose PHI, without an individual's signed authorization, only as expressly permitted or required by the Privacy Rule."[4] The second "provides tips about steps an individual can take to decrease how their cell phone or tablet collects and shares their health and other personal information without the individual's knowledge,"[5] and was created specifically to remind covered entities not to disclose patient PHI—including important reproductive care information (*as at issue in this case*, Dkt. 46 at ¶ 47)—to third parties over the internet. Furthermore, HHS's warning in the second June bulletin regarding the lack of security for PHI stored over the internet specifically related to the use of "period trackers and other health information apps"—*i.e.* non-HIPAA entities. Taken together, HHS issued the June bulletins to serve complimentary goals (neither of which can be reconciled with Rush's reading): remind covered entities to secure patient PHI and remind patients to avoid using "unnecessary or random apps, especially those that are 'free.'"

## III. PLAINTIFFS ADEQUATELY ALLEGE THEIR ICFA CLAIM

Rush argues Plaintiffs' claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") fail because Plaintiffs do not allege they were personally deceived by Rush's deceptive practices and thus have not pled proximate causation. This is not so. Plaintiffs allege

[3] https://www.hhs.gov/about/news/2022/06/29/hhs-issues-guidance-to-protect-patient-privacy-in-wake-of-supreme-court-decision-on-roe.html.

[4] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/phi-reproductive-health/index.html. HHS followed this bulletin with a Notice of Proposed Rulemaking on April 17, 2023 that modifies the current Privacy Rule standards post-*Dobbs* to *further limit* uses and disclosures of the PHI. 88 FR 23506-01.

[5] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/cell-phone-hipaa/index.html.

throughout the FAC that they had reasonable expectations of privacy grounded in HIPAA; Rush's express and implied promises of confidentiality; the physician-patient relationship; and other state and federal laws protecting the confidentiality of the communications. *See* Dkt. 46 ¶¶ 20 & 471. Under these circumstances, Plaintiffs were actually deceived because they reasonably expected Rush to keep their information and communications private.

Rush next argues Plaintiffs allege how every class member has "theoretically been harmed," but not "an explanation for how plaintiffs themselves suffered an 'actual, pecuniary loss . . . particularly when all of Rush's web-properties are free." This is doubly wrong. *First*, for Rush patients, the web-property is not a standalone service but part of Rush's portfolio of healthcare services provided to patients, for which patients pay money. Dkt. 46 ¶¶ 248-249. As part of its services, Rush promised privacy and security of health information. *Id.* ¶ 237. When it breached that promise, Rush provided a less valuable service than it had promised, giving rise to benefit of the bargain damages, *Id.* ¶¶ 237-238, which are routinely found actionable in data privacy actions with these facts. *See In re Marriott Intl., Inc. Customer Data Security Breach Litig.*, 440 F.Supp.3d 447, 462-63 (D. Md. 2020).

*Second*, in the process of breaching its promises to patients, Rush also caused patients to overpay by taking more of the patient's property in the exchange than Rush had stated that it would. Dkt. 46 ¶¶ 250-271. Under Illinois law, "[p]roperty consists of certain rights in things secured by law. These rights are usually defined to be the right of use, the right of exclusion, and the right of disposition." *Rigney v. City of Chicago*, 102 Ill. 64 (1881). "The term 'property' includes every species of valuable right and interest." *Illinois Cent. R. Co. v. Commissioners of Hwys and Town of Mattoon*, 161 Ill. 247, 251 (1896). The United States Supreme Court has likewise explained that "[c]onfidential business information has long been recognized as property" and that "[d]epriv[ation] of [the] right to exclusive use of . . . information" causes a property loss. *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987). Plaintiffs and other patients have exclusive and valuable legal rights to determine how their health

information is used or disclosed for anything beyond health care operations. As such, Rush's actions to take and use more of that information than it otherwise promised is an actual, pecuniary loss.

If Facebook and Google stole the information from Rush, Rush of course would have suffered an actual, pecuniary loss. And patients' property rights in such data are greater than Rush's. Plaintiffs and other Rush patients' "loss of value of property in their personal identifying information" is another cognizable injury in data breach cases. *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill. May 31, 2001) (plaintiff stated a claim for misappropriation of trade secrets, including customer lists and habits); *Marriott*, 440 F. Supp. 3d at 460-62; *see also Doe v. Virginia Mason*, 2020 WL 1983046, at *1 (King Cty., Wash.).

Rush's reliance on *Gubala v. Time Warner*, 846 F.3d 909 (7th Cir. 2017) is misplaced. In *Gubala*, the Seventh Circuit found lack of standing where the plaintiff alleged the defendant cable company retained his general personal information for longer than statutorily allowed, but specifically noted the "plaintiff ha[d] not alleged that Time Warner has ever given away or leaked or lost any of his personal information or intends to give it away or is at risk of having the information stolen from it." *Id.* at 910. Nor was there any allegation the defendant wrongfully obtained the information in the first place. The court explained the plaintiff "hasn't been deprived of anything." *Id.* at 913. Here, Plaintiffs have adequately alleged that Rush deprived them of their right to exclusively determine of how the specific personal information at issue in this litigation is used and disseminated. In Illinois, such rights "secured by law" are considered "property" and their violation confers standing and damages.

## IV. PLAINTIFFS ADEQUATELY ALLEGE INTRUSION BY RUSH

Rush argues that Plaintiffs did not allege any intrusion. This ignores the well-pled allegations of the FAC. Rush intrudes upon Plaintiffs' seclusion by (1) bugging its own properties that it encourages patients to visit; and (2) bugging patient communications devices and computers by placing Facebook and Google cookies on them that are disguised as belonging to Rush. Dkt. 46 ¶¶

16-17, 56, 78(a). These are classic acts of invasion of privacy—actionable on their own—regardless of whether any subsequent transmission of data is made to Facebook and Google. *See Johnson v. Kmart Corp.*, 311 Ill. App.3d 573, 595 (2000) (actionable intrusion for "the act of placing private detectives, posing as employees, in the workplace to solicit highly personal information about defendant's employees" and distinguishing that act from later publication); *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006, 1008 (2007) (actionable intrusion for "entry into plaintiff's home" under "false pretense"). Other states agree. For example, in *Hamberger v. Eastman*, 106 N.H. 107, 111 (N.H. 1964), the Court explained that intrusion "does not require publicity and communication to third persons" where the defendant installed a tracking device in the plaintiffs' home. Here, there is privacy harm in the mere fact that Plaintiffs' healthcare provider has breached a cardinal rule of the medical profession.

## V. PLAINTIFFS ADEQUATELY ALLEGE PUBLICITY

This appears to be a case of first impression on the issue of whether disclosures to massive marketing companies like Facebook and Google are sufficient to satisfy the "publicity" element for a "public disclosure of private facts" claim.[6] To plaintiffs' knowledge, only case is on point—and plaintiffs prevailed. *In re Facebook, Cons. Priv. User Profile Lit.*, 402 F. Supp. 3d 767, 796 (N.D. Cal. 2019).

## VI. PLAINTIFFS ADEQUATELY ALLEGE TRESPASS TO COMPUTING DEVICES

Rush again re-writes the FAC when it argues Plaintiffs' trespass claim is based "on trespass to an intangible such as digital information contained on a USB drive." Dkt. 50 at 12. This ignores the chattels involved are patients' personal computing devices (smartphones, tablets, and computers), *i.e.*, tangible chattels. In Illinois, trespass to chattels does not require "physical interference." "An injury to or interference with possession, with or without physical force, constitutes trespass to personal property." *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (*citing* Illinois Law

[6] As Rush acknowledges (Dkt. 50 at 4), Plaintiffs allege that Google is "the world's largest data company" with "massive reach," and "Facebook operates the world's largest social media company." Dkt. 46 ¶¶ 79, 90.

& Practice, § 3). The tort is committed by "using or intermeddling with a chattel in the possession of another." *Id.* (citing Restatement (Second) of Torts, § 217). In *Sotelo*, the trespass claim was based on the defendant downloading "spyware" onto the plaintiffs' computers "to track a computer user's web browsing behavior[.]" *Id.* at 1223. *Sotelo* held that these facts are sufficient to state a claim for trespass to chattels under Illinois law, explaining that "the cause of action may be asserted by an individual computer user who alleges unauthorized electronic contact with his computer system that causes harm, such as Spyware." *Id.* at 1230. *Ogbolumani v. Young*, 2015 IL App (1st) 141930-U, the case relied upon by Rush, even cites *Sotelo* with approval. Here, Plaintiffs allege the same essential facts as *Sotelo*: the defendant deposited unwanted tracking devices onto Plaintiffs' personal computing devices to track their Internet communications and, in the process, impaired the condition, quality, and value of those devices, including "total deprivation of their use of their computing devices to private communicate with Rush." Dkt. 46 ¶ 425. This states a claim.

## VII. PLAINTIFFS HAVE AN ACTION FOR BREACH OF CONTRACT

Rush argues patient-status is not protected under Illinois law and thus, Plaintiffs cannot bring a breach of contract claim for unauthorized disclosure of patient status. Rush cites no authority for this proposition. Regardless of whether certain conduct is otherwise legal, if a party to a contract promises not to engage in conduct, and then does so anyway, there is a claim for breach of contract. Here, Rush ignores the 21 contract promises at issue (Dkt. 46 ¶ 237(1)-(21)).

Next, Rush argues it has immunity for breach of contract under an exculpatory clause. Dkt. 50 at 13-14. Rush ignores that although "a person may by contract avoid liability for his or her *negligence*," the same is not true for fraud or intentional misconduct *Larsen v. Vic Tanny Intl.*, 130 Ill. App. 574, 576 (1984). Rush does not cite any Illinois case upholding an exculpatory clause for intentional breach of contract or an intentional tort. Even if it could, "[e]xculpatory clauses are not favored, and courts will closely scrutinize them and strictly construe them against the party seeking to

rely on them, especially when that party also drafted the waiver." *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 396 (1986). Also, an exculpatory clause will not be enforced where "there is a substantial disparity of the parties' bargaining position, the social relationship between the parties militates against upholding the clause, or enforcement of the exculpatory clause would violate public policy." *Hawkins v. Capital Fitness, Inc.*, 2015 IL App. (1st) 133716, ¶ 18. This case presents a classic fact scenario where an exculpatory clause is not enforceable:

1. Rush's breaches were intentional and it made 21 false or misleading promises to the contrary, and an additional 16 false or misleading statements in extra-contractual documents.

2. There is a substantial disparity in the parties' bargaining position. Rush is Plaintiffs' healthcare provider and Plaintiffs' access to the patient portal (and their medical records contained therein) is contingent upon the patients' acceptance of a contract of adhesion that was drafted by Rush and not subject to any negotiation.

3. The social relationship between the parties militates against upholding the clause because Rush is the patients' healthcare provider. That relationship carries duties that go beyond a traditional arms-length contract negotiation between businesses – or even between business and consumers.

4. Enforcement of the exculpatory clause would violate public policy by permitting healthcare providers to shirk important security and privacy promises of medical records via contracts of adhesion that providers force upon patients merely seeking access to their own medical records. A healthcare provider cannot be permitted to hold medical records hostage, subject to the patient's "agreement" to an exculpatory clause. Strong public policy favors privacy and security of healthcare information and ensuring patients feel secure in communicating with their providers online.[7]

Thus, Rush's attempt to avoid liability for knowing breach of contract should be rejected.

[7] *See* Nationwide Privacy and Security Framework ("Adoption of privacy and security protections is essential to establishing the public trust necessary for effective electronic exchange of individually identifiable health information."); ONC Federal Health IT Strategic Plan (Federal policy is "that the privacy and security of individually identifiable health information should be protected wherever it is electronically transmitted, maintained, or received."); 75 F.R. 44368 (Top public policy priority "to ensure adequate privacy and security protection for personal health information"); 75 F.R. 44369 (Jan. 13, 2010) ("[M]aintaining privacy and security is crucial for every … hospital … that uses certified EHR technology[.]").

## VIII. PLAIINTIFFS' GOOD FAITH AND FAIR DEALING CLAIMS SHOULD BE CONSIDERED WITH THE CONTRACT

In Illinois, "[e]very contract contains an implied covenant of good faith and fair dealing," which is used as an aid to interpret contracts. *Northern Trust Co. v. VII South Michigan Assoc.*, 276 Ill. App. 3d 355, 367 (1995). "The covenant . . . requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* That Illinois prohibits a stand-alone claim is an important matter of form, but not substance. Accordingly, based on Rush's argument, Plaintiffs agree that the claim should be dismissed as a standalone claim so long as the allegations are then incorporated and subsumed within the breach of contract claim. *See* Dkt. 46 ¶ 427.

## IX. PLAINTIFFS ADEQUATELY ALLEGE DETRIMENT FOR QUASI-CONTRACT

Plaintiffs' quasi-contract/unjust enrichment claim is expressly "pleaded in the alternative" to their breach of contract claims (Counts XIII and IX). This necessarily implies the statement "to the extent it is determined a contract does not exist or otherwise apply." Dkt. 50 at 16 (*citing Hernandez v. Ill. Inst. Of Tech.*, 63 F.4th 661, 672 (7th Cir. 2023)). In addition, Plaintiffs have alleged detriment, *i.e.,* that they conferred a benefit upon Rush, that Rush "unjustly retained in violation of fundamental principles of equity." Rush's argument that a plaintiff must show an intent to sell their property to allege detriment from an unauthorized use or taking is not the law. *See In re Anthem, Inc., Data Breach Litig.*, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016) ("Plaintiffs are not required to plead that there was a market for their PII and that they somehow also intended to sell their own PII," they may be required to allege one or the other, but "not both."). Under Rush's logic, an environmentalist who purchases property with oil deposits with no intent to ever use the oil and who, in fact, would prohibit any subsequent purchaser from using the oil, would suffer no damage if their neighbor used directional drilling to obtain the oil and then sold it for the neighbor's own benefit. That is inconsistent with longstanding legal principles. *See, e.g., Phillips v. Washington Legal Found.*, 524 U.S. 156, 170 (1998)

("While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property."); Restatement (Second) of Torts § 911 (1979), cmt e. ("Some things may have no exchange value but may be valuable to the owner").

## X. PLAINTIFFS ADEQUATELY ALLEGE RUSH IS A "PRINCIPAL"

The Illinois Eavesdropping Act creates a civil cause of action against an eavesdropper and "his principal" for the interception, recording, or transcription, "in a surreptitious manner, [of] any private electronic communication" by a non-party without "the consent of *all parties* to the private electronic communication." 720 Ill. Stat. §§ 5/14-2(a)(3); 5/14-6. Under the Act, a "principal" is "any person who: (1) knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or (2) knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or (3) directs another to use an eavesdropping device illegally on his or her behalf." 18 Ill. Stat. § 5/14-1(c). An "eavesdropping device" is "any device capable of being used to . . . intercept . . . electronic communications[.]" The statute itself does not define "intercept," but the term is defined under the federal equivalent as the "acquisition of the contents of any . . . electronic . . . communication." 18 U.S.C. § 2510(4).

Rush argues this claim is inconsistent with Plaintiffs' other allegations "that Rush surreptitiously intercepted the parties' own communications, not that Rush directed some other third-party to do so." Rush is incorrect. Allegations that Rush, Google, Facebook, and Bidtellect all "intercepted" patient communications are not inconsistent. To intercept simply means "to acquire" and there is no straight-faced argument that Plaintiffs claims are inconsistent with that approach. Moreover, every other court to consider whether a patient has stated an adequate Wiretap claim in states with all-party consent statutes (like Illinois) based on the facts alleged here has found that the patients do have such a claim. *See* Dkt. 25-1 (*Virginia Mason*), 25-2 (*MedStar*), 25-5 (*Sutter*).

There is a slight twist under Illinois law. Liability may not be imposed on a party to the communication for acquiring its own communications—but may be based on a party to the communication's actions as a "principal" for a third-party interceptor. Rush argues that it is not a "principal" under Illinois law for three reasons. *First*, Rush argues "Google, Facebook, and Bidtellect are not Rush employees." This misreads the statute. The term "employ" is not defined by the statute and its ordinary meaning is broader than "an employer" in an "employer-employee" relationship. To "employ" means "to make use of," "to hire," "to use as an agent or substitute in transacting business," or "to commission and entrust with the performance of certain acts or functions[.]" Black's Law Dictionary (11th ed. 2019). For examples that "employ" such meaning, *see Scully v. Foster Wheeler Corp.*, 178 F.2d 170, 175 (7th Cir. 1949) ("it was necessary for defendant to *employ* a third party"); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 470 (7th Cir. 2020) ("Comcast will only allow RCN to join the interconnects if RCN *employs* Comcast spotlight instead of Viamedia."); *U.S. v. Gomez*, 712 F.3d 1146, 1158 (7th Cir. 2013) (the defendants "*employed* a ruse."). If the legislature had intended the term "principal" to only apply to employer-employee relationships, it would have used the narrower term of "employer" rather than "principal." Here, Plaintiffs have adequately alleged Rush "employed," *i.e.,* "made use of" Facebook, Google, and Bidtellect to have those companies acquire patient communications, even though Facebook, Google, and Bidtellect are not parties to the communication.

*Second*, Rush argues it neither "derived any benefit or information from the illegal use of an eavesdropping device" by Facebook, Google, or Bidtellect or "direct[ed]" those companies to "intercept" the communications. Rush apparently reasons that "because Rush itself pla[c]ed the source code on Rush's own web properties," it did not derive any benefit from Facebook or Google's subsequent use of the device or direct Facebook or Google to acquire the communications. This argument makes no sense. If a person (1) places an eavesdropping device in a room to record a conversation they are having with someone else; (2) re-directs the contents of the communication to

a third-party outside of the room; (3) contracts with the third-party to ensure the third-party acquires the information; and (4) "derives benefit or information" from the third-parties use of the eavesdropping device, they are liable as a principal—regardless of who first placed the eavesdropping device in place. There is no "placement" requirement in the statute. Here, Plaintiffs have adequately alleged that Rush derived "benefit or information" from Facebook and Google's acquisition of the information. Dkt. 46, ¶¶ 267-271; 209(e); 474. If Rush were not benefitting, why would it re-direct the communications to Facebook and Google? Plaintiffs have also adequately alleged that Rush directed Facebook and Google to acquire the communications by placing the tracking code on its web-properties, causing Google and Facebook to intercept Plaintiffs' communications. *Id.* at ¶¶ 414-19.

## XI. PLAINTIFFS STILL HAVE A DECEPTIVE TRADE PRACTICES CLAIM

Rush argues the Court should dismiss the IDTPA claim because it stopped the unlawful behavior after Plaintiffs filed suit. But it is well established that "voluntary cessation of allegedly illegal conduct does not moot a case" seeking injunctive relief because "if it did, the courts would be compelled to leave the defendant free to return to his old way." *U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (cleaned up). In the absence of an order, Rush may resume its unlawful activities and Plaintiffs have standing to seek an order requiring Rush to protect the confidentiality of their communications given Rush's past conduct and misrepresentations. *Id.*; *see also BMG Music v. Gonzalez*, 430 F.3d 888, 893 (7th Cir. 2005) ("A private party's discontinuation of unlawful conduct does not make the dispute moot, however. An injunction remains appropriate to ensure that the misconduct does not recur as soon as the case ends.").

## CONCLUSION

For all of these reasons, Rush's renewed motion to dismiss should be denied.

Dated: May 19, 2023

Respectfully Submitted,

*/s/ Corban S. Rhodes*

DICELLO LEVITT LLC
Adam J. Levitt
Amy E. Keller
Nada Djordjevic
Sharon Cruz
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
Fax.: (312) 253-1443
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
ndjordjevic@dicellolevitt.com
scruz@dicellolevitt.com

DICELLO LEVITT LLC
David A. Straite*
Corban Rhodes
485 Lexington Ave., 10th Floor
New York, New York 10017
Tel.: (646) 933-1000
Fax.: (646) 494-9648
dstraite@dicellolevitt.com
crhodes@dicellolevitt.com

SIMMONS HANLY CONROY
Jason 'Jay' Barnes*
Eric S. Johnson
112 Madison Ave., 7th Floor
New York, NY 10016
Tel.: (212) 784-6400
Fax: (212) 213-5949
jaybarnes@simmonsfirm.com
ejohnson@simmonsfirm.com

***Attorneys for Plaintiffs***
*Admitted *pro hac vice*