**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | | |
|---|---|---|
| MARGUERITE KUROWSKI and BRENDA MCCLENDON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>*v.*<br><br>RUSH SYSTEM FOR HEALTH d/b/a RUSH UNIVERSITY SYSTEM FOR HEALTH,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:22-cv-05380<br><br>The Honorable Matthew F. Kennelly, Judge |

**DEFENDANT RUSH SYSTEM FOR HEALTH'S OPPOSITION BRIEF TO PLAINTIFFS' RENEWED MOTION TO COMPEL**

Rush thanks the Court for the opportunity to respond to plaintiffs' motion to compel. There are numerous grounds to cover, and Rush strives to do so efficiently.

1. Plaintiffs' motion to compel is based on an alleged discovery agreement over search terms that plaintiffs claim Rush "reneged" on that was finally consummated on April 19, 2024. (Dkt. # 122, Mot. at pg. 2; Dkt. # 123, Mem. in Supp. at pgs. 1, 5.) April 19, 2024, however, was Rush's due date for substantial completion of document production, not the date for the parties to reach an agreement on electronic document search terms. As detailed below, Rush repeatedly tried to reach an agreement with plaintiffs prior to that time to move the case forward. It just never happened.

a. As plaintiffs state, the parties met following the conference with the Court on February 13, 2024. Rush agrees with plaintiffs that the intent of the parties was that the parties would agree to reasonable search terms and run them over an extended period. Rush made clear immediately, however, that this agreement was not unconditional, but instead contingent upon the parties actually being to reach an agreement on reasonable search terms. (*See* Ex. A, *Email*

*meet and confer compilation*, at pg. 2 (Rush revisions to joint status report); Dkt. # 107, Joint Status Report, at pgs. 2-3 (same).)

This should not have been that difficult a process, and the Court gave the parties plenty of time to reach an agreement: "Parties to complete meet and confer process on relevant time period and ESI search terms – 3/5/2024." (Dkt. # 108, Min. Entry.)

The negotiations proved to be a never-ending process, however, through no fault of Rush. At the initial February 13 meeting, Rush agreed to analyze certain of the search terms to see why they were hitting on so many documents. (Dkt. # 107, at pg. 3.) Plaintiffs in turn agreed to rework certain of the search strings that were creating too many hits. (*Id.*) On February 23, 2023, Rush provided plaintiffs with the initial search term hit reports based on the reworked search terms, as well as with Rush's analysis of the search terms for revision. (*See* Ex. A, *Meet and confer compilation* at pg. 3.)

From the search term hit report, certain of plaintiffs' proposed revised search terms continued not to work. For example, one proposed search string on its own returned 143,707 additional documents to review, and a second proposed search string on its own returned an additional 184,483 documents to review. (*Id.* at pg. 4.)

Plaintiffs did not abandon these search terms to move the case forward, however. Plaintiffs instead demanded "to see sample documents for each search string to get a sense of the types of documents with hits." (*Id.* at pg. 5.) Rush provided plaintiffs with these sample documents on February 29, 2024. (*Id.* at pgs. 6-7.)

The next day, on Friday, March 1, the parties then held a nearly hour long meet and confer call, in an attempt to meet the Court's March 5 deadline. (Ex. B, *Carney declaration,* at ¶

2.) During the call, Rush agreed to run certain other search term hit reports for plaintiffs in an attempt to reach an agreement. (*Id.*)

Rush ran these search term hit reports the following Monday morning, and emailed them to plaintiffs with the following message: "Nada, Corban, following up on from Friday, here is the hit terms report, limited by custodians. There are some of the search terms that are still running high, but seems like we are closing in, Dave." (Ex. A, *Meet and confer compilation* at pg. 8.)

b. At that point, however, everything stopped, notwithstanding the Court's March 5 deadline, because plaintiffs' counsel had a hearing in another matter. (Dkt. # 114, Stat. Rpt. At pg. 2.) Plaintiffs ultimately responded to Rush's March 4 email on March 10. (*See* Ex. A, *Meet and confer compilation* at pg. 9.) The following day, plaintiffs asked Rush to agree to extend the date to file objections with the Court from March 12 to March 25. (*Id.* at pg. 10.) Rush agreed without hesitation to do so. (*Id.* at pg. 11.) Rush further agreed with certain of the parties' negotiated search terms at that same time. (*Id.*)

On March 13 and March 15, respectively, Rush then provided plaintiffs with additional and requested search term hit reports from the March 10 email. (*See id.* at pgs. 12-13.) In the March 15 email, Rush proposed an alternative that would have ended the parties' already month-old negotiations over electronic document search terms. (*Id.* at pg. 13 ("Nada, what about this. If we put 'polic*' in the second string the first two become duplicative, then we added terms to the ones that were getting a lot of hits.").) This proposal would have still required Rush to review an additional 4,465 email documents for these final outstanding terms alone, in addition to all the other terms, even for the January 1, 2020 through September 30, 2022 documents upon which the terms were being analyzed. (*Id.* at pg. 14.)

Plaintiffs did not even consider Rush's proposal, nor incorporate the proposal into the parties' discussions. (*Id.* at pg. 15.) Instead, plaintiffs sent Rush an email with a spreadsheet purporting to attach "our most recent understanding of where the parties stand re ESI search terms/strings," which "*does not include any changes on what you sent March 13 and March 15*," so "please let me know where/how those would fit," and "please put that in the Notes column for now." (*Id.*)

c. On March 18, the parties had the status conference with the Court, where the Court agreed to extend the objections filing date to March 25. (Dkt. # 119, Min. Entry.) On March 19 and March 20, Rush went through an exhaustive review of plaintiffs' spreadsheet of terms, in an attempt to finally end the parties' negotiations. (*See* Ex. C, *Rush 3/20/24 email*, at pgs. 1 & 12-14.)

On March 20, Rush emailed plaintiffs with a proposal, between two attachments, that would have once again ended the parties' negotiations and allowed the parties to come to an agreement. (*Id.* at pgs. 12-14.) The email is independently attached as Exhibit C to this opposition so the Court can review it; the terms were exhaustive and more than fair. (*Id.*) In the March 20 email to plaintiffs, Rush naively stated: "Hopefully this will do it." (*Id.* at pg. 1.)

Later that afternoon, plaintiffs again rejected Rush's proposal, instead choosing to merely update the "spreadsheet." (Ex. A, *Meet and confer* compilation at pg. 17.) The following day, far from reaching any agreement, plaintiffs' counsel again demanded that Rush run additional search terms hit reports, and unequivocally stated: "Plaintiffs *do not agree* to drop from search terms. Let's talk." (*Id.* at pg. 18 (emphasis in original).)

Thus, the whole premise of plaintiffs' motion to compel, that the parties reached some agreement on search terms, is contrary to plaintiffs' own, unequivocal statements. Rush tried to reach an agreement, it simply did not work.

d. On Monday morning, March 25, Rush again emailed plaintiffs, explaining: "From our perspective, the new search strings that Rush had proposed were designed to resolve everything, given how comprehensive this list of search terms already is. We are looking at an excel spreadsheet with 79 individual lines of comprehensive search terms." (Ex. A, *Meet and confer compilation*, at pg. 19.) That said: "If having Ashish run those final two hit reports will help to finally resolve this I will ask Ashish to do so this morning and report back." (*Id.*)

Later that same morning, Rush provided plaintiffs with yet another hit term search report, which showed once again that one of plaintiffs' proposed alternatives simply was not working: the search string again, on its own, hit on 44,119 documents. (*Id.* at pgs. 20-21.) Plaintiffs again refused to compromise in the name of moving the case forward. Instead, over the course of the next two days, plaintiffs demanded that Rush run even more search term hit reports, notwithstanding the fact that the Court's March 25 deadline for filing objections had also now passed. (*Id.* at pgs. 22-23.)

Rush could have said the March 25 deadline had passed and plaintiffs were too late. Instead, in an attempt to avoid where we are now, first on March 27, and then again on April 1, Rush provided plaintiffs with the requested additional search term hit reports. (*Id.* at pgs. 24-25.) Subsequently, and finally, in an April 8 email Rush stated: "Nada, we will agree to these final terms in the interest of getting this done: Marketing w/5 increase* Marketing w/5 target*." (*Id*. at pg. 26.) Rush further explained: "That is a more than reasonable compromise over search terms

under the terms of our protocol." (*Id.*) "If it is possible to email me a list of the final search terms so we have it for Ashish, we will begin producing by the end of the week." (*Id.*)

On April 10, just nine days before Rush's substantial completion of document production deadline (Dkt. # 108, Min. Entry), plaintiffs once again unequivocally rejected Rush's proposal, stating as follows: "Your proposal leaves out most of the terms in the current search string, and is not acceptable. Here is our proposed alternative." (Ex. A, *Meet and confer compilation*, at pg. 27.)

***Thus, as of April 10, 2024, the parties had been negotiating for nearly two months, and still had no agreement over search terms, notwithstanding Rush's repeated attempts and offers to make one.***

At that point Rush did the only thing that Rush could do: Rush ran plaintiffs' proposed search terms over the January 1, 2020 to September 30, 2022 documents, and produced those, in order to meet the Court's April 19, 2024 document production substantial completion deadline. (Ex. B, *Carney declaration* at ¶ 3.) This in turn caused Rush to review an additional 76,785 email documents, above and beyond the approximately 90,000 email documents that Rush had already reviewed in the case. (*Id.*) Rush produced an additional 11,774 email documents on April 19, 2024, and made a final clean up document production of 675 documents on April 30, 2024, in accord with the Court's scheduling order. (*Id.*)

As far as Rush is concerned, and in accord with the Court's scheduling order, plaintiffs' motion to compel should be denied, and document production in this case should be complete. There is a scheduling order in place, and Rush has met and remains prepared to meet that scheduling order. Quite simply, plaintiffs are asking the Court to enforce a discovery agreement

that never existed, because plaintiffs' own abusive litigation tactics prevented that agreement from ever being consummated in the first instance.

2. Plaintiffs' motion to compel proceeds from a second false premise: that Rush has prevented plaintiffs from seeking discovery outside the January 1, 2020 through September 30, 2022 period. As plaintiffs put it: "Rush arbitrarily seeks to prevent Plaintiffs' from obtaining discovery prior to 2020 or after the date the initial complaint was filed." (Opp. 1-2.)

This is not correct. Rush has thus far made thirteen document productions in this case. (Ex. B, *Carney declaration* ¶ 4.) These productions have totaled 24,373 documents, comprising 122,923 pages and more than 16.8 million kilobytes of data. (*Id.*) 8,712 of these documents have a created date before January 1, 2020. (*Id.*) 7,118 of these documents have a last modified date before January 1, 2020. (*Id.*) And 7,089 of these documents have both a created date and a last modified date before January 1, 2020. (*Id.*) This metadata has been provided to plaintiffs' counsel for each of these productions. (*Id.*, at ¶ 5.) Yet, plaintiffs do not mention it in their motion to compel.

Rush's question is thus this: How can plaintiffs file a motion to compel accusing Rush of arbitrarily limiting the scope of discovery in this case when it is clear from plaintiffs' arguments they are not reviewing the documents that are being produced in the case?

Rush is contemporaneously providing a sampling of these pre-January 1, 2020 documents under seal because Rush wants the Court to see the type of documents that Rush is producing. (*See Exhibits D & E, Pre-January 1, 2020 documents.*) Indeed, plaintiffs have relied on these documents when it inures to their benefit; documents from 2005 and 2017 that Rush had produced to plaintiffs were cited in the opposition brief to Rush's motion for judgment on the pleadings. (Dkt. # 109 (submitted under seal), at pgs. 3-4).)

Nor have these document productions by Rush in any way been unilateral. Based off the initial production, plaintiffs asked Rush to provide documents related to a Rush Privacy Academy. (Ex. B, *Carney declaration* at ¶ 6.) Rush found these documents and produced them. (*Id.*) Plaintiffs asked Rush to provide certain documents that were embedded as hyperlinks in emails from the initial electronic production. (*Id.*, ¶ 7.) Rush found these documents and produced them. (*Id.*) Plaintiffs asked Rush to provide web server log data for two dates: September 30, 2022, and October 5, 2022. (*Id.*, ¶ 8.) Rush did one better, and provided plaintiffs with complete Google Analytics data from those dates, showing every link that every visitor to Rush's website on those days would have clicked on. (*Id.*) These two data sets on their own would be enough for the parties to brief class certification.

As shown through their motion, plaintiffs also asked Rush to go back and find emails related to when Google Analytics and the Facebook Pixel were first put on Rush's website, in January 2006, and October 2016, respectively. (Dkt. # 123, Mem. in Supp. at pg. 5.) To do this, Rush went back and collected additional emails for two periods. First, for October 2005 – March 2006, to see if Rush could find emails related to when Rush first put Google Analytics. Second, for the period June 2016 through December 2016, to see if Rush could find emails related to the period when Rush first put the Facebook pixel on the website. (Ex. B, *Carney declaration* at ¶ 9.)

Plaintiffs make much of the fact that Rush only searched these documents for the term "Facebook" and "Google." (Dkt. # 123, Mem. in Supp. at pg. 4.) The whole purpose of the search was to find a very specific subset of documents, however, which would have contained these words. Moreover, these terms were decided upon in a call with plaintiffs. (Ex. B, *Carney declaration* at ¶ 10.) Rush asked plaintiffs if they wanted to run additional search terms, and offered to run these search terms. (*Id.*) Plaintiffs did not offer any additional search terms,

choosing instead to remain silent and complain later. (*Id.*) Rush thus ran the Facebook and Google search terms. Notably, they worked, revealing the precise string of emails where Rush first placed the Facebook pixel on Rush's website on October 6, 2016. (*See id.* at *Ex. 1*.)

With respect to Google, we are talking about finding emails related to an action that took place more than eighteen years ago now. (Ex. B, *Carney declaration* at ¶ 11.) The Google search term only hit on one document for the initial set of custodians: Courtney Satlak. (*Id.*) Rush marked this email as not responsive but it has now been produced; the document is an email talking about a Saturday Night Live skit where Google Maps was mentioned, that was why it hit on the search term. (*Id.* at Ex. 2.) Rush has also talked to Andy Reeder, Rush's Chief Privacy Officer, who was at Rush at the time, about additional custodians who might have been involved in the decision, and have provided plaintiffs with a list. (*Id.* at ¶ 12.) The documents Rush has for these custodians simply have not hit on the Google search term. (*Id.*)

Rush has thus tried to find this information for plaintiffs, Rush's numerous efforts simply have not worked. This is no surprise given how long ago the events we are talking about took place. Moreover, plaintiffs do not need this evidence to prove any disputed fact. Rush has admitted in sworn interrogatories that Google Analytics was on the website and exactly when Google Analytics was first placed on the website and the patient portal. (*Id.*) And plaintiffs are of course free to ask about this event further at depositions, and obtain additional discovery regarding the decision from that discovery mechanism.

All of this back and forth is requiring Rush to expend a significant amount of resources for this case. Rush's counsel noted that fact to plaintiffs in their final meet and confer before the filing of this motion. (*Id.*, ¶ 13.) Plaintiffs' response was not to see if there was a way to alleviate

these costs on the not-for-profit health care provider. Instead, plaintiffs' counsel's reponse was this: "I don't have a settlement offer yet," and then later "make me an offer." (*Id.*)

3. *Proportionality.* Plaintiffs filed their motion to compel prematurely without knowing the search term results over the additional documents. Thus, on its face plaintiffs' proportionality analysis does not address the facts at issue. The main thing of note from plaintiffs' proportionality analysis is that all references to their federal Wiretap Act claim have now been removed from the motion when it comes to the alleged amount in controversy. (Dkt. # 123, Opp. Br. at pg. 14; *but cf.* Dkt. # 101, Mem. in Supp., at pg. 13.)

Here are the facts so the Court has them: Running the search terms over the new documents would require Rush to review an additional 100,105 email documents, on top of the 150,000 email documents that Rush has already reviewed in the case. (Ex. B, *Carney declaration* at ¶ 14 & Ex. 3.) This is so even though no class has yet been certified in this case, and plaintiffs have not argued in opposing Rush's motion for judgment on the pleadings that plaintiffs have any actual damages on their claims. And, "[a]s applied to class actions, this proportionality standard further supports the notion that pre-certification discovery should not exceed what is necessary to permit the Court to make an informed decision on class certification." *Miner v. Gov't Payment Serv., Inc.*, 2017 WL 3909508, at *4 (N.D. Ill. Sept. 5, 2017); *see also Bilek v. Fed. Ins. Co.*, 2022 WL 18912277, at *3 (N.D. Ill. Dec. 12, 2022) (same).

Based upon a review of the billing from Rush's initial document production, the amount of money that this document review would cost Rush is approximately $86,500.00, including the required redactions for responsive documents and the preparation of a privilege log. (Ex. B, *Carney declaration* at ¶ 15.) Notably also missing from plaintiffs' motion is this: any argument as to how this additional discovery fits into the class certification analysis. To the contrary,

plaintiffs are focused on the merits and the fact that discovery in the case has not been bifurcated, and this discovery is allegedly relevant to the merits of plaintiffs' claims. (Dkt. # 123, Mem. in Supp. at pgs. 2-3, 15-16.)

Before plaintiffs filed their motion, however, Rush made the following proposal in an attempt to solve this problem and thus also prevent this motion:



RE: Rush v Kurowski - ESI Search Terms

Carney, David A.
To Nada Djordjevic
Cc Corban Rhodes; David Straite; 'ejohnson@simmonsfirm.com'; Hanna, Nathaniel O.
Tue 4/30/2024 8:59 AM

Nada, this is not what was said. Rush said this: we have been at this for six months and what we are doing is not working. We are not progressing the case forward. Rush is not blaming anyone for this, it is just the facts.

Further, the question is not on the scope of discovery the question is on timing. Rush has produced every document, over every search term, from January 1, 2020 through September 30, 2022. I never said Rush would not produce the documents from the additional periods, the issue is whether or not we do that now. That was the whole point of the conversation.

What Rush proposes, once again, is this: we all move on to class certification, based on the extensive document discovery that Rush has now produced. We would do so without prejudice to plaintiffs seeking more discovery on the merits following class certification. Rush agrees that Rush will not move for summary judgment on the named plaintiffs' claims pending class certification. That renders moot the need for any additional merits discovery at this time. To the extent we feel like we need to move Judge Kennelly for any changes to the schedule based on this plan we would be happy to do so and can discuss them at the May 24 status conference. This is an eminently reasonable proposal for moving the case forward, however.

I am going to be around all morning if you would like to discuss. As a final note, Rush is also making one smaller cleanup production of documents from the additional search terms today, it should be about 675 documents.

Thank you, Dave

**Dave Carney**
Partner
BakerHostetler
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7634

dcarney@bakerlaw.com
bakerlaw.com

Rush respectfully submits that Rush's motion for judgment on the pleadings, or in the alternative to certify the Wiretap Act question to the Seventh Circuit for interlocutory appeal, should be granted by the Court, before class certification proceedings. In the event that does not happen, Rush stands by the proposal set forth above. This proposal eliminates the problem of

having to do significant and costly discovery now that is not relevant to the questions that will be before the Court on class certification. *See In re Hulu Privacy Litigation*, 2014 WL 2758598, at *14 (N.D. Cal. June 17, 2014) (denying class certification because "substantial issues about remaining logged into Facebook and clearing and blocking cookies meant that the court cannot conclude on this record that common issues predominate over the individual ones").

4. Finally, plaintiffs argue the Court should require Rush to pay "Plaintiffs' costs and fees incurred when seeking the discovery sought herein and for bringing this motion." (Dkt. # 123, Mem. in Supp. at pg. 16.) Rush should be requesting attorneys' fees and expenses for responding to a motion to compel that is grounded in plaintiffs' continued refusal to make a reasonable compromise. *See Fisher v. County of Nassau*, 2011 WL 4899920, at *5 (E.D.N.Y. Oct. 13, 2011) (denying motion for sanctions made "wholly without factual or legal support," and stating: "Plaintiffs' counsel is cautioned in the strongest terms that frivolous motions for sanctions are themselves sanctionable.").

Rush will not respond in kind, however. The factual record makes clear that there is no justification for the vitriol and righteous indignation permeating plaintiffs' motion to compel. Rush did not renege on any agreement. Plaintiffs instead repeatedly rejected Rush's attempts to reach such an agreement. The Court should deny plaintiffs' motion to compel and grant Rush's motion for judgment on the pleadings.

Dated: May 8, 2024

Respectfully submitted,

By: */s/ David Carney*
*Counsel for Defendants*

David A. Carney
dcarney@bakerlaw.com
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: (216) 861-7634

Bonnie Keane DelGobbo
bdelgobbo@bakerlaw.com
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 416-6200
Facsimile: (312) 416-6201
Firm No. 46365

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on May 8, 2024, a true and correct copy of the foregoing *Opposition Brief* was served on counsel of record via the Court's electronic filing system.

*/s/ David Carney*
*Counsel for Rush System for Health*